202 N.J. Super. 148 (1985)
493 A.2d 1337
DONALD H. BROTHERTON AND NELLIE BROTHERTON, HIS WIFE, PLAINTIFFS,
v.
CELOTEX CORPORATION, RAYMARK INDUSTRIES, INC., GARLOCK, OWENS ILLINOIS, OWENS CORNING, EAGLE PICKER, DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided March 15, 1985.
*151 Richard S. Mannella for plaintiffs Donald and Nellie Brotherton (Ergood & Gavin, attorneys).
Louis N. Magazzu for defendant Celotex Corporation (Buonadonna, Benson & Speziali, attorneys).
Todd Brandon Eder for defendant Raymark Industries, Inc. (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys).
Joseph L. Garrubbo for defendant Garlock.
Richard P. O'Leary for defendant Owens Illinois (McCarter & English, attorneys).
*152 Jonathan A. Eron for defendant Owens Corning (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys).
Bruce M. Gunn for defendant Eagle Picker (Martin, Crawshaw & Mayfield, attorneys).
VAN SCIVER, J.S.C.
This is an asbestos-related personal injury action. Plaintiffs, in addition to compensatory damages, seek to recover punitive damages against various defendants, including the Celotex Corporation. The claim against Celotex is based upon activities by its predecessor corporation to conceal knowledge concerning the health risks posed by exposure to asbestos.
In this motion for partial summary judgment, Celotex seeks a ruling that it cannot be held liable for punitive damages arising out of acts or omissions of its predecessor corporation. Celotex's objections to a punitive damage award are three-fold: (1) It contends that punitive damages are not available against a successor corporation under New Jersey law; (2) It questions the appropriateness of a punitive damage award under the facts of this case; (3) It urges that the imposition of punitive damages in multi-jurisdictional/multi-claimant litigation is both inappropriate and unconstitutional.
After careful consideration of the matter, I reject those arguments submitted by defendant and hold that punitive damages are recoverable against a successor corporation in a multi-jurisdictional products liability action.
The Celotex Corporation is the survivor of two mergers. On April 10, 1970, Philip Carey Corporation merged into Briggs Manufacturing Company. The survivor of that merger changed its name to Panacon Corporation. Panacon continued to operate Philip-Carey as a division which manufactured and sold roofing and insulation materials but which had no separate corporate or legal existence. On April 17, 1972, Celotex purchased seventy-five percent of the stock of Panacon. Panacon Corporation merged into Celotex Corporation on December 29, *153 1972. Celotex continued to operate Philip-Carey in the same form that it existed under Panacon until the end of 1973.
Philip-Carey Corporation started to distribute asbestos insulation products in 1906. This practice continued until Philip-Carey ceased to exist. Celotex Corporation first became involved in the manufacture and sale of asbestos-containing products when it merged with Panacon in 1972, and continued to manufacture asbestos-containing cement until 1977.
Plaintiff in this action was employed from 1939 until 1973 by Public Service Electric and Gas in Burlington, New Jersey, where he allegedly came into contact with materials containing asbestos which were supplied, manufactured or sold by Celotex.
A discussion of the defendant moving party's argument follows:

Availability of Punitive Damages
New Jersey law governs the liability of Celotex for business transacted within this state. Chicago Title & Trust Co. v. Young, 90 N.J. Eq. 27, 34 (1919); Baldwin v. Berry Automatic Lubricator Corp., 99 N.J. Eq. 57, 60 (1926), mod., 100 N.J. Eq. 362 (1926). Pursuant to N.J.S.A. § 14A:10-6(e) a survivor corporation is liable for all the obligations and liabilities of each of the corporations with which it has merged. A survivor corporation is the single corporation that is formed by the parties to a plan of merger and is so designated by that plan. Id. § 14A:10-6(a). The effect of this statute is to impose liability on a successor corporation for any obligation incurred by its predecessor so long as a merger took place.
A merger between Celotex and Panacon is established by the facts in this case. On December 29, 1972, Articles of Merger were filed with the Secretary of State for the State of Ohio. According to its terms, Celotex Corporation was to be the survivor of a merger between itself and the Panacon Corporation. This document complied in all respects with the requirements for merger set forth in relevant Ohio statutes. *154 Ohio Rev. Code Ann. §§ 1701.79-1701.82 (1978).[1] By executing these Articles of Merger, Celotex became statutorily bound to absorb all the liabilities of Panacon, including any potential claims for punitive damages.
Articles of Merger were viewed similarly by the United States District Court in Tretter v. Rapid American Corp., 514 F. Supp. 1344 (E.D.Miss. 1981). In Tretter, a worker allegedly injured by exposure to asbestos filed suit against Rapid American Corporation, the successor of Philip Carey Manufacturing Corporation, (Old Carey). Rapid American assigned all the assets and liabilities it acquired from Old Carey to a newly-formed subsidiary, New Carey. Relying on the common law rule that a transferee assumes its predecessor's liabilities when a merger occurs, the court held that Rapid American assumed liability for compensatory damages when it merged with Old Carey. Id. at 1346-1347. The court considered the merger agreement as evidence that a merger had taken place. Id. at 1346.
The New Jersey Supreme Court's decision in State Dept. of Environmental Protection v. Ventron Corp., 94 N.J. 473 (1983), also illustrates this principle. The Court held the successor corporation, Ventron, liable for the environmental torts of its predecessor, Wood Ridge, because the two companies had merged, Id. at 503. Ventron is distinguishable from the instant case in that the merger was evidenced by Ventron's cash purchase of all the stock in Wood Ridge rather than by Articles of Merger. Nevertheless, the Court still found that evidence of merger imposed liability on the surviving corporation under N.J.S.A. § 14A:10-6(c). Ibid.
Defendant urges this court to follow the lead of the court in In re Related Asbestos Cases, 566 F. Supp. 818 (N.D.Cal. 1983), which denied plaintiff's claim for punitive damages in an asbestos *155 action. Defendant's argument is premised upon the fact that the California District Court reached its result by distinguishing Ray v. Alad, 19 Cal.3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977), the seminal California case extending liability for compensatory damages to successor corporations in strict liability actions. Since Alad was adopted by the New Jersey Supreme Court in Ramirez v. Amsted Industries, Inc., 86 N.J. 332 (1981), defendant argues that Asbestos is controlling on the issue of punitive damages. I disagree.
In Asbestos, the record contained no Articles of Merger. Absent proof that a merger took place, the California rule analogous to N.J.S.A. § 14A:10-6 could not be invoked and the court was forced to evaluate alternative theories of liability. Asbestos, supra, 566 F. Supp. at 821. This the court did by examining whether or not the rule of Ray v. Alad could be extended to punitive damages. Id. at 821-823. The court concluded that the justifications underlying successor liability for compensatory damages articulated in Ray v. Alad were incompatible with the goals of punitive damages and refused to expand the scope of the Alad rule. Id. at 823.
The policy discussion contained in Asbestos is inapplicable to the instant case. Unlike Asbestos, there is unequivocal proof here that a merger occurred between Panacon and Celotex. Since proof of merger is sufficient to establish liability under N.J.S.A. 14A:10-6, it is unnecessary to determine whether the policy bases supporting successor liability for compensatory damages apply with equal force to punitive damages. Consequently, I decline to follow the lead of the California District Court in its Asbestos decision. I must, therefore, conclude that by statute, as well as by common law authority, a successor becomes liable for all obligations of its predecessor when the two corporations merge.[2]

*156 Appropriateness of Punitive Damages

The circumstances under which punitive damages should be recoverable against a successor corporation were discussed by the court in Martin v. Johns-Manville Corp., 322 Pa.Super. 348, 469 A.2d 655 (1983), appeal pending (April 2, 1984). Martin also was an asbestos action involving the same corporate defendants named in this suit. The court determined that punitive damages were not appropriate in all situations where compensatory damages were awarded against a successor corporation. Id. at 666. Since punishment and deterrence are the primary goals accomplished by a punitive damage award, the court saw no value in holding the successor liable for the misconduct of the predecessor's shareholders, officers, directors and management who escaped unharmed. Ibid. To avoid this result, the court adopted the "continuation theory" for determining a successor's liability for punitive damages. Id. at 667. The continuation theory permits an award of punitive damages if the plaintiff can show "such a degree of identity of the successor with the predecessor as to justify the conclusion that those responsible for the reckless conduct of the predecessor will be punished, and the successor will be deterred from similar conduct." Ibid. The court did not delineate what constituted a sufficient degree of identity but suggested that it be resolved on a case-by-case basis. Ibid. (citing Moe v. Transamerica Title Insurance Company, 21 Cal. App.3d 289, 304-305, 98 Cal. Rptr. 547, 556-557 (1971). However, the court noted that this requirement might be satisfied by the continuation *157 of fewer shareholders who are directly responsible for the egregious conduct. Id. at 667.
The continuation theory adopted by the court in Martin essentially is the same test used by the court in Wilson v. Fare Well Corp., 140 N.J. Super. 476 (Law Div. 1976), to determine successor liability for compensatory damages. In Wilson, the court recognized the harshness of the then existing de facto merger theory enunciated by the court in McKee v. Harris-Seybold Co., 109 N.J. Super. 555 (Law Div. 1970), aff'd per curiam, 118 N.J. Super. 480 (App.Div. 1972). Id., 140 N.J. Super. at 486. The de facto merger theory permitted recovery of compensatory damages against a successor corporation where plaintiff could prove: (1) transfer of assets of one corporation in exchange for the shares of the other corporation; (2) liquidation of the transferor; and (3) assumption of liabilities of the transferee. McKee, supra, 109 N.J. Super. at 565-66. The court in Wilson criticized this theory because the results were often inconsistent and numerous plaintiffs were denied a remedy simply because of the form by which an asset transfer was made. Wilson, supra, 140 N.J. Super. at 490. Reasoning that a corporate entity which enjoys all the benefits of an ongoing concern also should assume its burdens, the court held that the key factor in successor liability was the degree to which a predecessor's business entity remained intact. Ibid.
It is my conclusion that the continuation test set forth in Wilson can be used to determine a successor's liability for punitive damages. Its adoption would assist our courts in striking a fair balance between an individual's recovery and a corporation's liability in situations where the actual wrongdoer no longer exists and the successor is sufficiently connected to the culpable conduct. Its adoption also is consistent with New Jersey precedent regarding compensatory damages.
In Ramirez v. Amsted Industries, Inc., 86 N.J. 332 (1981), the New Jersey Supreme Court responded to conflicting precedents *158 regarding the liability of a successor corporation for injury caused by a product issued by its predecessor. See Annotation, "Products Liability: Liability of Successor Corporation for Injury or Damage Caused by Product Issued by Predecessor," 66 ALR 3d 824 (1975). Citing the same weaknesses in the de facto merger theory which were identified by the court in Wilson, the court examined two alternatives to the rule of McKee. Ramirez, supra, 86 N.J. at 341-43. The first of these alternatives, a combined expansion of the McKee rule and the continuation test, was rejected by the court on the ground that "the successor's continuation of the actual manufacturing operation and not ... commonality of ownership and management between the predecessor's and successor's corporate entities" was the crucial factor in determining successor liability for compensatory damages. Id. at 347. The court also feared inconsistencies similar to those encountered when applying the McKee rule. Id. at 348. By adopting the second alternative, the rule of Ray v. Alad, 19 Cal.3d at 34, 560 P.2d at 11, 136 Cal. Rptr. at 582 (1977), the Ramirez court attempted to alleviate inconsistent results. Ramirez, 86 N.J. at 358. The rule enunciated by the court in Alad, referred to as the "productline" theory, holds a successor corporation strictly liable for all its predecessors obligations when all or substantially all of the assets are purchased for cash and essentially all the same manufacturing operations are continued. Ibid. Thus, the Ramirez court rejected the prior McKee standard and replaced it with the product line theory.
Rejection of the continuation test by the court in Ramirez does not preclude its adoption in this case. The holding in Ramirez was restricted to the issue of compensatory damages. The only issue presented by defendant in this case is a successor's liability for punitive damages. Therefore, Ramirez is not controlling in this matter.
Equally important is the distinct purposes for which these theories are adopted. The product line theory is designed *159 to liberalize recovery for plaintiffs left remediless against a defunct corporation. Ramirez, 86 N.J. at 350. This aim is consistent with the rationale behind compensatory damages, which is to reimburse individuals for losses sustained as a result of another's wrongful or negligent conduct. The continuation test fulfills a different function. This test allows punitive damages to be assessed against the successor corporation where it shares certain similarities with its predecessor. By creating an identity requirement, the continuation test furthers the primary objectives of punitive damages, i.e., punishment of the wrongdoer and deterrence of similar conduct in the future. Because the product line theory and the continuation test promote different goals, the potential for conflict between them is eliminated. Thus, the separate purposes accomplished by each enables them to operate co-extensively.[3]
The California District Court in Asbestos, supra, 566 F. Supp. at 821, is in accord. After determining that Ray v. Alad could not be expanded to include punitive damages liability, the court considered whether liability could be imposed under the continuation test set forth by the court in Moe v. Transamerica Title Insurance Company, 21 Cal. App.3d 289, 98 Cal. Rptr. 547 (1971). Id. at 823. See also Martin, supra, 469 A.2d at 667 (citing Moe for continuation test). The court concluded that plaintiff had not adduced sufficient evidence on the identity issue. Asbestos, supra, 566 F. Supp. at 823. Although the plaintiff planned to introduce evidence to establish how the corporate changes occurred, the continuation of certain employees after the acquisition, and continuation of the same product lines, none of these proofs existed at the time the summary judgment motion was brought. Ibid. In fact, the only evidence *160 of continuation proferred by plaintiff was the deposition of Lewis Pechstein who joined Philip Carey in 1955 and was subsequently elected Secretary of Celotex in 1977. Id. at 824. However, plaintiff did not show any involvement by Pechstein in any culpable conduct.
The present case differs significantly from Asbestos. Plaintiff has offered evidence indicating that Mr. Pechstein was personally involved in the defense of asbestos litigation. In addition, Thomas Cantlon, a Workman's Compensation actuary for Philip Carey, communicated to Mr. Pechstein his concern about the company's potential liability resulting from asbestos exposure. Upon Mr. Cantlon's suggestion, Mr. Pechstein hired Dr. Thomas Muncuso, a medical consultant, to advise the company. When Dr. Mancuso discovered the relationship between asbestos and cancer and communicated his findings to Mr. Pechstein in 1963, his services were terminated.
This evidence is sufficient to establish a genuine issue of material fact regarding the similarities between Panacon and Celotex. In Martin, supra, 469 A.2d at 667, the court noted that the continuation requirement may be satisfied by fewer persons who are directly responsible for the egregious conduct. I conclude that the activities of Mr. Pechstein satisfy this requirement. See also Neal v. Carey Mines Ltd., 548 F. Supp. 357, 391 (E.D.Pa. 1982).
Defendant suggests that the present case is distinguishable because Celotex took steps to reverse Panacon's wrongful conduct. See Drayton v. Jiffee Chemical Corp., 395 F. Supp. 1081 (N.D.Ohio 1975), mod. and aff'd. 591 F.2d 352 (6th Cir.1978). In Drayton, punitive damages were not assessed against the successor corporation because it immediately set out to reformulate the dangerous product and make it safe in direct contradiction to the egregious conduct of Jiffee management. Id. at 1098. No similar showing has been made in the instant case. Conversely, the evidence indicates that warning labels were placed on asbestos products solely because they *161 were required by federal regulations. In addition, there is evidence indicating that Celotex had access to information concerning the dangers of asbestos and failed to act upon it. Moreover, Celotex continued to manufacture cement containing asbestos until 1977. In light of this evidence, it would be inappropriate to insulate defendant from a potential punitive damage award.

Award of Punitive Damages in Multi-Jurisdictional/Multi-Claimant Litigation
The chief argument against an award of punitive damages in mass market product liability actions is the potential for overkill. Supporters of this position contend that allowing punitive recovery would exhaust resources needed to compensate subsequent plaintiffs. See Martin, supra, 469 A.2d at 661-62. These concerns were discussed at length in Roginsky v. Richardson-Merrill, 378 F.2d 832 (2nd Cir.1967), a case involving an anti-cholesterol drug found to produce adverse effects in consumers. Hundreds of lawsuits were filed against the drug manufacturer. Although the court feared the consequences of permitting punitive damages, it could not prohibit them under applicable state law. Id. at 841. The only court that adopted the reasoning of the court in Roginsky was the Fifth Circuit in Jackson v. Johns-Manville Sales Corp., 727 F.2d 506 (5th Cir.1984), mod. on reh'g., 750 F.2d 1341 (5th Cir.1985). Jackson was an asbestos case where defendants claimed that punitive damages were not recoverable in multi-claimant strict liability actions under Mississippi law. Finding that multiple punitive awards would destroy enterprises necessary to facilitate the loss distribution function of strict liability actions, the court denied punitive recovery to plaintiffs. Id. at 526, 529. However, in an en banc rehearing, the court found that Jackson involved an unresolved question of state law which should be certified to the Mississippi Supreme Court. Id., 750 F.2d 1314, 1327.
*162 Other courts examining this issue have determined that state law allowed the imposition of a punitive award. Hansen v. Johns-Manville Sales Corp., 734 F.2d 1036 (5th Cir.1984) (applying Texas Law); Moran v. Johns-Manville Sales Corp., 691 F.2d 811 (6th Cir.1982) (applying Ohio Law); Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (1st Cir.1984) (applying Florida Law); Martin v. Johns-Manville Corp., 322 Pa.Super. 348, 469 A.2d 655 (1983). The only notable exception to this trend is the New Jersey District Court's opinion in Gold v. Johns-Manville Sales Corp., 553 F. Supp. 482 (D.N.J. 1982). The court in that case believed that the New Jersey Supreme Court would not allow punitive damages in a strict liability action because: the fault notion of a punitive award was inconsistent with the strict liability rationale; the cost of poor managerial decisions should not be borne by the public through increased product prices; and investment in preventive research would not be encouraged in a case where punitive damages were awarded because defendants allegedly suppressed known information. Id. at 484-85.
The Appellate Division in Fischer v. Johns-Manville Corp., 193 N.J. Super. 113 (App.Div. 1984), certif. granted, 97 N.J. 598 (1984), disagreed. The court found that while the theory of strict liability relieves the plaintiff from proving fault, it does not preclude the plaintiff from so doing in cases involving outrageous conduct. Id., 193 N.J. Super. at 124. In addition, the court cited several public policy considerations supporting a punitive damage award. Among them was the risk that manufacturers would "write off the public's injury as a cost of doing business by the payment of compensatory damages, for which there is typically insurance coverage." Id. at 125. The court also found that the threat of insolvency from payment of punitive damages was greatly exaggerated. Id. at 128. See also, Rublin, Asbestos Fallout, Barron's February 11, 1985, at 7, col. 4 ("... major asbestos products manufacturers continue to insist that a resolution of the snowballing asbestos cases won't materially pinch their pocketbooks."). For these reasons, *163 the court in Fischer concluded that punitive damages were recoverable in a multi-party strict liability action. Fischer, supra, 193 N.J. Super. at 130. See also Gogol v. Johns-Manville Sales Corp., 595 F. Supp. 971, 976, (D.N.J. 1984).
Based on Fischer, I conclude that the imposition of punitive damage awards in multi-jurisdictional, multi-claimant litigation may be appropriate as well as necessary for the protection of the public from egregious conduct. In reaching this conclusion, I am not insensitive to the financial burden placed upon asbestos manufacturers by multiple punitive damage awards. However, I am confident that our legal system provides alternatives to a complete bar of punitive recovery. One such alternative proposed by the court in Janssens is that evidence of the effect of punitive recovery be admissible to mitigate the size of the award. Janssens, 463 So.2d 242, 253. Additionally, in Martin the court considered options such as remittitur and limiting instructions to the jury regarding past and potential liability. Martin, 469 A.2d at 665. Bearing in mind that an award of punitive damages should not cause the financial ruin of a business concern, I would concur with the policy considerations referred to in the opinion of the Appellate Division in Fischer.

Constitutionality of Punitive Damage Award
The defendant argues that the imposition of punitive damages is barred under the commerce clause, violates due process, and constitutes criminal punishment requiring constitutional guarantees. With respect to these first two assertions, I have found no case law supporting these propositions and interestingly enough, defendant does not cite any relevant decisions on these issues. Absent convincing authority, this court lacks any basis for excluding consideration of a punitive damage award either on commerce clause or due process grounds.
*164 The distinguishing features of a criminal action were discussed by the Supreme Court in Breed v. Jones, 421 U.S. 519, 530, 95 S.Ct. 1779, 1786, 44 L.Ed.2d 346 (1975). The Court concluded that the following factors were determinative: the purpose of the proceeding; its potential consequences; and whether or not the action was brought and backed by the resources of the state. Applying this test to a punitive damage award in an asbestos case, the court in Hansen v. Johns-Manville, 734 F.2d at 1036, held that a punitive damage action was not a criminal proceeding. The court reasoned that defendants were not found to be in violation of any criminal laws, that no stigma attached to the punitive award, and that the action was privately filed and funded. Ibid. The same reasoning is applicable to the instant case. Thus, I conclude that defendant is not entitled to the constitutional safeguards which accompany a criminal proceeding.
For the reasons stated, the motion of the defendant Celotex, is respectfully denied. Plaintiffs' shall provide the court with a form of judgment compatible with these conclusions consented to as to form or on notice to defendants in accordance with the Rules.
NOTES
[1] The law of the state of incorporation regulates the internal affairs of a corporation. Baldwin, 99 N.J. Eq. at 60.
[2] My conclusion is supported by the distinction in the New Jersey Business Corporation Act between statutory liability under N.J.S.A. § 14A:10-6 and common law liability under the de facto merger theory, the issue addressed by Ray v. Alad, supra. N.J.S.A. § 14A:10-12 was enacted in 1974 to provide shareholders of the transferor in a de facto merger with the same rights they would have in a statutory merger. N.J.S.A. § 14A:10-12, Final Report of the Corporation Law Revision Committee, June 15, 1972, p. XII. The statute demonstrates that the Legislature did not contemplate the legal effect of de facto mergers when the act was originally created. Its enactment is relevant to the present case because it indicates that statutory mergers require separate treatment under our statutory scheme.
[3] Pennsylvania courts have reached the same conclusion. In Dawejko v. Jorgensen, 290 Pa.Super. 15, 434 A.2d 106 (1981), the Pennsylvania Superior Court adopted the product line theory for awarding compensatory damages but in Martin, the court applied the continuation test to a claim for punitive damages. Martin, 469 A.2d at 667.