Samuel RAMOS and Carmen Ramos, Plaintiffs,

v.

COLLINS & AIKMAN GROUP, INC., SMS Holding Co., Inc. and Saginaw Machine Systems, Inc., Defendants and Cross–Claimants.

Civil Action No. 93–40095–NMG.

United States District Court, D. Massachusetts.

Oct. 8, 1997.

Edward M. Swartz, Alan L. Cantor, Swartz & Swartz, Boston, MA, for Plaintiffs.

John C. Bartenstein, Jerome M. Leonard, Darlene C. Lynch, E. David Pemstein, Ropes & Gray, Boston, MA, John F. Hurley, Jr., MacCarthy, Pojani & Hurley, Worcester, MA, Louis M. Ciavarra, George A. Balko, III, Anthony D. Pellegrini, Bowditch & Dewey, Worcester, MA, John W. Griffen, Jr., Edward L. Ruby, Williams, Schaefer, Ruby

& Williams, Birmingham, MI, for Defendants and Cross–Claimants.

Jeffrey S. Stern, Sugarman, Rogers, Barshak & Cohen, Boston, MA, pro se.

## MEMORANDUM AND ORDER

GORTON, District Judge.

This is a products liability action for personal injuries that the plaintiff, Samuel Ramos, allegedly sustained in 1992 while operating a Kux metal die casting machine. The die casting machine was manufactured and sold by the Kux Machine Division of The Wickes Corporation in 1975. Because The Wickes Corporation and its Kux Machine Division have ceased to do business under those names, the plaintiffs have named as defendants three corporations, each of which is alleged to be responsible as a successor for the liabilities of the former Kux Machine Division: 1) Collins & Aikman Group, Inc. ("Collins & Aikman"), 2) SMS Holding Co., Inc. ("SMS") and 3) Saginaw Machine Systems, Inc. ("Saginaw").

Collins & Aikman is the successor to The Wickes Corporation ("Wickes"). SMS and Saginaw (collectively, "the Saginaw Defendants") are the successors to a former subsidiary of Wickes known as Wickes Machine Tool Group, Inc. Collins & Aikman and the Saginaw Defendants have filed cross-claims against each other for defense and indemnification, each contending that the other is primarily responsible for the liabilities of the former Kux Machine Division and the defense of this action. Pending before this Court are the defendants' cross motions for summary judgment.

## I. *Background*

In 1963, Wickes acquired the Kux Machine Co., ("Kux"). In 1976, the operations of Kux were consolidated into the Wickes Machine Division. In 1981, Wickes combined its several existing machine tool businesses into a single division, the Wickes Machine Tool Group ("the Division"). Following that reorganization, the Division continued to operate the Kux die casting machine business as part of its Wickes Machine manufacturing unit.

In late 1981, Wickes began to experience major financial difficulties and made plans to file for protection under Chapter 11 of the Bankruptcy Code. Its management team determined that the Division could function more effectively outside of the bankruptcy proceeding. Accordingly, the Division was reorganized as a separate, wholly-owned subsidiary corporation (known as Wickes Machine Tool Group, Inc. ("WMTG")) on April 23, 1982, immediately prior to the Chapter 11 filing by Wickes.

The assets and liabilities of the Division were sold to and acquired by the newly incorporated WMTG as memorialized in a Bill of Sale and an Assumption of Liabilities Agreement.

About six months after the incorporation of WMTG, Wickes began to seek buyers for its subsidiary, as part of the Chapter 11 bankruptcy. WMTG's managers began to negotiate with the owners of Wickes a leveraged buyout of WMTG. The parties entered into a Stock Purchase Agreement that provided for the sale by Wickes of 100% of the shares of WMTG to SMS, a corporation organized by WMTG's management for the purpose of acquiring that subsidiary from Wickes. SMS subsequently changed the name of the WMTG to Saginaw Machine Systems, Inc.

Section 6.9 of the Stock Purchase Agreement contained comprehensive provisions for the "Allocation of Company Liabilities." Under its terms, Wickes agreed to be responsible for known, scheduled product liability claims against WMTG, and for the first $150,000 of unknown claims. The Saginaw Defendants agreed to be responsible for all other claims.

In 1986, the Stock Purchase Agreement was amended. Wickes forgave SMS a substantial portion of the remaining purchase price and, in exchange, SMS relieved Wickes of virtually all of its remaining obligations under the Stock Purchase Agreement.

In 1992, Wickes changed its name to Collins & Aikman. Collins & Aikman is, therefore, the corporate successor in interest to Wickes. The Saginaw Defendants are the corporate successors to WMTG. The issue

pending before this Court is whether the Assignment of Liabilities Agreement transferred liability for the present tort action from Wickes to WMTG.

## II. *Analysis*

### A. *Summary Judgment*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986). Once the moving party demonstrates an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts establishing the existence of at least one genuine issue of material fact. *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir.1991).

### B. *The Saginaw Defendants' Responsibility for WMTG's Liabilities*

■ The 1983 Stock Purchase Agreement did not originally transfer all of WMTG's liabilities to SMS because Wickes remained obligated to pay certain product liability claims. The 1986 Amendment to that agreement, however, specifically relieved Wickes from those remaining obligations. The Amendment stated:

Any obligations or liabilities assumed or retained by or imposed against Wickes pursuant to the Stock Purchase Agreement, whether inuring to the benefit of [SMS], [Saginaw], or any other party, are hereby deemed satisfied in their entirety.

Following the 1986 Amendment, therefore, Wickes had no further obligation to defend or indemnify SMS with respect to liabilities of WMTG. Conversely, SMS expressly assumed responsibility for all such liabilities. Accordingly, under the terms of the 1983 Stock Purchase Agreement, as modified by the 1986 Amendment, SMS is responsible for all of the liabilities of WMTG.

■ Saginaw is also responsible for all of WMTG's liabilities because after acquiring WMTG, SMS simply changed the name of the company to Saginaw Machine Systems, Inc. Thus, Saginaw retained WMTG's liabili-

ties. *See Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir.1980); *Seagram Distillers Co. v. Alcoholic Beverages Control Comm'n*, 401 Mass. 713, 720, 519 N.E.2d 276 (1988). Whatever obligations WMTG acquired under the terms of the 1982 Assumption of Liabilities Agreement are now, therefore, the obligations of Saginaw.

### C. *The Bill of Sale and the Assumption of Liabilities Agreement*

Because the Saginaw Defendants are responsible for all of the liabilities of WMTG, only one question remains: whether the 1982 Assumption of Liabilities Agreement transfers to WMTG (now the Saginaw Defendants) liability for the personal injury claims in this action. The Agreement states:

[Wickes] shall sell to WMTG the Acquisition Assets (as defined in the Bill of Sale) of the Division of Seller known as the Wickes Machine Tool Group (the "Machine Tool Group") in exchange for the assumption by [WMTG] of all the liabilities of [Wickes] related to Machine Tool Group; and ...

WMTG does hereby assume and agree to perform and discharge all liabilities and obligations of Machine Tool Group disclosed on its attached, 1982 Balance Sheet ... and all other liabilities and obligations relating to the Acquisition Assets or arising under any contracts, agreements, commitments, understandings and leases constituting part of the Acquisition Assets.

Both Collins & Aikman and the Saginaw Defendants agree that WMTG assumed only those liabilities relating to the Acquisition Assets enumerated in the Bill of Sale. The parties disagree on what the term "Acquisition Assets" meant. The Bill of Sale states:

The Acquisition Assets are defined to include the following:

1. All accounts receivable arising in the ordinary course of business of the Division ...

2. All inventories of the Division.

3. All office equipment and trade fixtures used by the Division.

4. All prepaid expenses of the Division.

5. All contracts, agreements, commitments, understandings, sale orders, purchase orders, rights, leases, trademarks, trade names, business names or styles, goodwill, and other rights related to the Division and its business.

Cash of the Division on hand and in banks shall not be transferred or deemed to be transferred hereunder.

The Bill of Sale clearly and unambiguously transferred to WMTG all the assets of the Division, other than cash. The definition of Acquisition Assets includes "[a]ll ... other rights related to the Division and its business." The list of Acquisition Assets serves to identify those assets, not to limit them and the only exception, cash, is specifically listed. Wickes, therefore, transferred all of the Division's assets, other than cash, to WMTG.

The Saginaw Defendants contend that the Acquisition Assets included only then-current assets of the Division. They argue that the Kux horizontal die cast machine business no longer existed at the time of the asset transfer and was, therefore, not part of that transfer.

■■■ To determine whether the Kux machine line was among the assets transferred from Wickes to WMTG, it is helpful to consider extrinsic evidence. Under the law of California, which governs the Bill of Sale and the Assumption of Liabilities Agreement, such evidence is rightly considered.[1] *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). In the *Pacific Gas* case the California Supreme Court held that:

[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the

language of the instrument is reasonably susceptible.

*Pacific Gas*, 69 Cal.Rptr. 561, 442 P.2d at 644; *see also Brinderson–Newberg Joint Venture v. Pacific Erectors*, 971 F.2d 272, 277 (9th Cir.1992).

■■■ The Saginaw defendants admit that part of the business of WMTG they acquired when they purchased its stock in 1983 was the right to manufacture Kux horizontal die casting machines in the future should they choose to do so. Regensburger (*Osorio*) Dep. at 26–28; Buckley Dep. at 83. The Saginaw Defendants further concede that 1) WMTG attempted to sell the Kux die casting machine product line to another die casting manufacturer in late 1982 (Buckley Dep. at 98–100) and 2) the business of WMTG that they acquired included the spare parts and service business for machines previously sold. *See* Regensburger (*Osorio*) Dep. at 15; Buckley Dep. at 50–52. Based upon that evidence, the Kux machine line was clearly among the Acquisition Assets transferred to WMTG by the Bill of Sale.

The Assumption of Liabilities Agreement provided for the assumption of all of the Division's liabilities. Because there was no express exception, WMTG assumed inchoate or contingent product liability claims (*see, e.g.*, Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15–16 (2nd Cir.1993); Kessinger v. Grefco, Inc., 875 F.2d 153, 155 (7th Cir.1989); Philadelphia Electric. Co. v. Hercules, Inc., 762 F.2d 303, 309 (3rd Cir.1985)), including liability for inchoate or contingent product liability claims related to the Kux machine line. The Saginaw Defendants have a duty, therefore, to defend and indemnify Collins & Aikman in the pending lawsuit.

## ORDER

For the foregoing reasons:

---

1. Neither the Bill of Sale nor the Assumption of Liabilities Agreement specifies the law by which it is to be governed; therefore, applying the choice of law principles of Massachusetts, *see Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991), the law of Califor-

nia, where Wickes was headquartered, where both documents were executed and where the planning and all other steps necessary to the bankruptcy reorganization were carried out, governs the contract. *See Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 635, 473 N.E.2d 662 (1985).

1) the Saginaw Defendants' motion for summary judgment is **DENIED**; and

2) Collins & Aikman's motion for summary judgment is **ALLOWED**.

So ordered.