782 A.2d 931 (2001)
344 N.J. Super. 490
German AREVALO, Plaintiff-Appellant,
v.
SAGINAW MACHINE SYSTEMS, INC., and SMS Holding Co., Inc., Defendants,
and
Collins & Aikman Products Co., Inc., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 2001.
Decided October 26, 2001.
*932 Brian E. Mahoney argued the cause for appellant (Ginarte, O'Dwyer, Winograd & Laracuente, attorneys; John D. O'Dwyer, Newark, of counsel; Mr. Mahoney, on the brief).
Lisa S. Daly, Newark, argued the cause for respondent Collins & Aikman Products *933 Co., Inc. (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, attorneys; Ms. Daly and Mara Zazzali, on the brief).
Before Judges PRESSLER, CIANCIA and PARRILLO.
The opinion of the court was delivered by PARRILLO, J.A.D.
Leave to appeal was granted plaintiff German Arevalo from summary judgment dismissing his product liability lawsuit against one of several defendants, Collins & Aikman Products Co., Inc. (C & A), on the ground that, as a successor company, C & A did not continue the line of the allegedly defective product manufactured by its predecessor-in-interest, the Wickes Corporation. We reverse because the product line exception established in Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 431 A.2d 811 (1981), does not operate to shield C & A from strict liability in tort imposed by other well settled principles of law.
On April 29, 1996, plaintiff was injured while operating a diecasting machine on the premises of his employer, Abco Diecasters, in Newark, New Jersey. While trying to remove a casting that was stuck in the die, plaintiff pushed a wrong button with his left hand, causing the die to close on his right hand, mangling it. The machine involved, a Kux brand, horizontal metal diecasting machine, was manufactured by the Kux Division of the Wickes Corporation (Wickes). This division had at one time operated as an independent company, Wickes having purchased all its assets in 1963 and then continuing the manufacture of diecasting machines. The machine in question was manufactured by Wickes in 1971. In 1976, Wickes consolidated those operations into the Wickes Machine Division, which continued to manufacture and market Kux diecasting equipment. In 1981, Wickes further consolidated its several machine tool businesses into a single division known as the Wickes Machine Tool Group.
Sometime in 1981, Wickes experienced financial difficulties and planned to file for Chapter 11 bankruptcy. Because it was determined that the Wickes Machine Tool Group could function more effectively outside of the bankruptcy proceeding, immediately prior to the Wickes's Chapter 11 filing, the Wickes Machine Tool Group was "spun off" and incorporated as a separate, wholly-owned subsidiary corporation called the Wickes Machine Tool Group, Inc. (WMTG) on April 23, 1982. As noted, Wickes owned all the stock of WMTG. In this reorganization, WMTG acquired all the assets of the Wickes Machine Tool Group for diecasting machinery manufacture in exchange for an assumption of liabilities agreement.
About six months after the incorporation of WMTG and as part of the Chapter 11 bankruptcy, Wickes sought buyers for this subsidiary. Eventually, the managers of WMTG negotiated a leveraged buyout of the subsidiary from Wickes and organized a corporation, SMS Holdings Co., Inc. (SMS), for the purpose of buying the subsidiary. In a November 18, 1983 Stock Purchase Agreement, Wickes sold 100% of its stock in WMTG to SMS, and the subsidiary then became known as Saginaw Machine Systems, Inc. (Saginaw).[1] There *934 after Wickes remained in business but no longer manufactured the product in question.
Wickes emerged from Chapter 11 reorganization and, sometime between 1983 and 1986, changed its name to Wickes Companies, Inc. (Wickes II). In 1992, Wickes II changed its name once again to Collins & Aikman Group, Inc., and eventually acquired or created a wholly-owned subsidiary, Collins & Aikman Products Co., into which it statutorily merged in 1994. The surviving corporation was known as Collins & Aikman Products Co., Inc. (C & A). The product line of C & A never included diecasting machinery.
As a result of the injuries sustained, plaintiff sued Saginaw, its parent SMS, and C & A, seeking to recover damages on theories of strict liability in tort for defective design and manufacture and breach of the post-manufacture duty to warn. After discovery had been completed, all defendants moved for summary judgment on the ground that successor corporate liability does not attach because none of them continued the line of the allegedly defective product that caused plaintiff's injuries. As to defendant C & A, the motion judge agreed.[2] In its decision granting C & A summary judgment, the court found that C & A was a successor company, not liable to plaintiff as a matter of law:
After reviewing all the documents and facts submitted to the Court, the Court finds that as a matter of law that Collins & Aikman is a successor. It is not Wickesit is notit is still not Wickes Corporation. It is a successor. It's not the same entity and, therefore, based upon the case law and the facts before it, the Court finds that as a matter of law Collins & Aikman is a successor and is not liable under the theory of successor liability or under the post-manufacture duty to warn. So, therefore, the Court will grant summary judgment in favor of Collins & Aikman on both theories, successor liability and duty to warn.
In its decision denying plaintiff's motion for reconsideration, the court further explained that there is no assumption of liability under Ramirez, supra, when, prior to merger, the predecessor sells off the operational unit responsible for the allegedly defective machine and, after merger, the successor produces a different product line:
The Court finds, as the Court previously found, that Collins & Aikman, as a matter of law, is not the same corporation, and the Court bases that on the *935 following facts. Accepting plaintiff's argument that these name changes were really just that and nothing more significant,... [i.e.] the name change to Wickes Company and the name change to Collins & Aikman, ... those name changes did occur after Wickes MachineWickes Corporation sold Wickes Machine Tool Group to SMS. So, that part of the division was taken out prior to the name changes.
Then there's the merger, which occurred in 1994 when the Collins & Aikman Group merged into Collins & Aikman Product Company, and Collins & Aikman Product Company manufactured something totally different. It manufactures, if my recollection is right, auto tops, floor systems and acoustical products.
So, the Court finds, given those changes, that Collins & Aikman is a successor corporation. It is not the same corporation as Wickes Corporation.[3]
In essence, the trial court was of the view that strict tort liability for a product defect attaches only where the "successor" company continues the product line of the original manufacturer and that, since the product line was discontinued before the merger of Wickes into C & A, defendant C & A is therefore not liable. We disagree because the law relating to successor liability does not apply to original manufacturers still extant and viable and because C & A, in the product liability context, is the same entity as Wickes, responsible for liability claims arising from defects in Wickes's products.
It is by now well-settled that strict liability for injuries caused by defective products placed into the stream of commerce is "an enterprise liability," Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 65, 207 A.2d 305 (1965), one that continues "so long as the defective product is present on the market." Ramirez, supra, 86 N.J. at 351, 431 A.2d 811. See also Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 169, 406 A.2d 140 (1979). In certain situations, liability is extended to successor corporations where the original product manufacturer is defunct or no longer in business. Ramirez, supra, 86 N.J. at 340-41, 431 A.2d 811. A primary justification for imposing strict tort liability on successor corporations when the original manufacturer no longer exists at the time of injury is that an injured party might otherwise be left without a remedy. Mettinger v. Globe Slicing Machine Co., 153 N.J. 371, 383, 709 A.2d 779 (1998).[4]
Thus, in Ray v. Alad Corp., 19 Cal. 3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), where the California Supreme Court adopted the "product-line exception" to corporate-successor non-liability, the buyer had purchased the seller's assets, stock in trade, trade name and good will, and the seller agreed to dissolve its corporate existence as soon as practical. In Ramirez, *936 supra, our Supreme Court adopted the rule of Ray in a case where plaintiff would similarly have been left remediless against the original manufacturer which, as in Ray, had ceased to exist after the sale of its assets. The purchaser of the assets, who continued the same manufacturing operation, was therefore the only viable corporate entity that the plaintiff could sue for his injuries.
The Ramirez doctrine of corporate successor liability was extended to intermediate successor corporations in Nieves v. Bruno Sherman Corp., 86 N.J. 361, 431 A.2d 826 (1981), a case in which the original manufacturer distributed the cash proceeds of the sale of its business to its shareholders and underwent dissolution. And in Lefever v. K.P. Hovnanian Enterprises, Inc., 160 N.J. 307, 734 A.2d 290 (1999), our Supreme Court applied the Ramirez "product-line" successor liability rule to the purchaser of all the assets of the original manufacturer at a bankruptcy sale, even where the injury giving rise to liability occurred before bankruptcy.
Common to all downstream corporate liability cases in the product liability context, in addition to the dissolution of the selling company, is the determination whether there is a sufficient nexus between the successor and predecessor corporations to warrant the imposition of a duty on the former to respond to the claims of tortious conduct by the latter. In each of the referenced cases that nexus was found in the successor's continuation of the allegedly defective product line previously manufactured or distributed by the predecessor. "The product-line exception represents our perception of the appropriate balance in the ordinary case between compensating injured parties and the uninhibited transfer of assets." Lefever, supra, 160 N.J. at 328, 734 A.2d 290 (Pollock, J., dissenting) (citing Mettinger, supra, 153 N.J. at 381, 709 A.2d 779).
Here, however, we need not look to that event, much less deem its absence dispositive of the liability issue, because the connection between Wickes and C & A is otherwise clear, direct, and obvious. It is the same corporation, in the product liability context, that manufactured and distributed the allegedly defective product.
Unlike Ramirez and its progeny, which involve successor companies purchasing the assets of unrelated entities that then cease to exist, this case involves a corporate reorganization no more, no lessresulting in a viable restructured entity from which plaintiff may seek remedy. Wickes, the original manufacturer, was redesignated "C & A" after a series of corporate eventsthe spin-off and sale of its machine tool division; its emergence from Chapter 11 reorganization; its various name changes; and its eventual absorption into its wholly-owned subsidiarynone of which has broken the essential and undeniable identity of the two.
Significantly, Wickes's manufacture of the machine in question in 1971 long predated the 1981 consolidation of its several existing machine tool businesses, including the diecasting machine operation, into a single division, the Wickes Machine Tool Group; the 1982 incorporation of this division into a wholly-owned subsidiary; and the 1983 sale of the stock of this subsidiary to SMS. Thus, at the time of manufacture by its unincorporated unit, Wickes, as a single integrated business enterprise, was answerable in tort to claims of harm caused by this product and remained potentially liable despite the subsequent incorporation of this division. Indeed, by that time, the diecasting machine in question had already been manufactured and distributed into the stream of commerce and in fact was purchased by plaintiff's *937 employer Abco sometime in the mid 1980's. Consequently, this is not a case where plaintiff seeks to impose liability vicariously upon the parent for acts of its subsidiary on the theory that the constituent entity is merely the "alter-ego" of Wickes. See Karo Marketing Corp., Inc. v. Playdrome America, 331 N.J.Super. 430, 440, 752 A.2d 341 (App.Div.), certif. denied, 165 N.J. 603, 762 A.2d 217 (2000); Coppa v. Taxation Div. Director, 8 N.J. Tax 236, 245 (Tax 1986). Rather, liability here is sought to attach directly to Wickes, as a single continuous economic entity, based on Wickes's own alleged tortious conduct. Because Wickes remained in business after the incorporation of its machine tool division and continued to exist, it cannot avoid liability for the product it manufactured by simply transferring all diecasting machinery manufacturing operations, assets, and accompanying obligations to the newly formed entity. So long as Wickes remains in business and continues to exist, it remains liable for its own conduct. Cf. State, Dep't of Environmental Protection v. Ventron, 94 N.J. 473, 502-03, 468 A.2d 150 (1983).
By the same token, when in the following year SMS purchased this newly created subsidiary of Wickes, the availability of SMS as another potential source of liability did not relieve Wickes, as the original manufacturer, of responsibility for the alleged defective product. See Nieves v. Bruno Sherman Corp., supra, 86 N.J. at 369-70, 431 A.2d 826; Holloway v. State, 237 N.J.Super. 71, 566 A.2d 1177 (Law Div.1989), aff'd in part, rev'd in part on other grounds, 239 N.J.Super. 554, 571 A.2d 1324 (App.Div.1990), aff'd in part, rev'd in part on other grounds, 125 N.J. 386, 593 A.2d 716 (1991). Neither did Wickes's emergence from bankruptcy at around the same time. An intervening bankruptcy does not necessarily cut off potential liability for defective products manufactured, and even injuries sustained, prior to that event. Lefever, supra, 160 N.J. at 327, 734 A.2d 290. Similarly, the several corporate name changes post bankruptcy did not shield Wickes from liability or prevent plaintiff from seeking recourse against it as the original manufacturer. See Ramos v. Collins & Aikman Group, Inc., 977 F.Supp. 537, 539 (D.Mass. 1997) (holding that a corporate successor [SMS] that merely changed the name of a division [Wickes Machine Tool Group, Inc.] purchased from another company [Wickes] is still responsible for the division's liabilities); Wilson v. Fare Well Corp., 140 N.J.Super. 476, 491, 356 A.2d 458 (Law Div. 1976) (holding that a "corporation cannot disable itself from responding to liability by changing its name or distributing all its assets"). Although Wickes may have changed its corporate name, it did not change its corporate identity. There is no indication of any change in the common identity of its directors, officers or shareholders, or that its legal identity as the original manufacturer of the alleged defective product was altered in any way other than "form" only.
Finally, we do not view Wickes's 1994 absorption into its subsidiary corporation as constituting a break in its continuous corporate existence. On the contrary, in a statutory merger such as this, the liabilities of the absorbed company accrue to the surviving corporation under both statutory and common law. A merger of a parent corporation into its wholly-owned subsidiary is allowable under the law of both Delaware, where C & A is incorporated, and New Jersey, the situs of this litigation. See Del.Code Ann., tit. 8, § 253(a) (2000); N.J.S.A. 14A:10-5.1.[5] Thus, *938 N.J.S.A. 14A:10-5.1, entitled "Merger of subsidiary corporation," provides:
(1) A domestic corporation owning at least 90% of the outstanding shares of each class and series of another domestic corporation or corporations, may merge the other corporation or corporations into itself, or may merge itself, or itself and any subsidiary corporation or corporations, into any subsidiary corporation, without approval of the shareholders of any of the corporations.
The effect of such a statutory merger, as occurred here, is clear. According to N.J.S.A. 14A:10-6(e):
The surviving or new corporation shall be liable for all the obligations and liabilities of each of the corporations so merged or consolidated; and any claim existing or action or proceeding pending by or against any of such corporations may be enforced as if such merger or consolidation had not taken place. Neither the rights of creditors nor any liens upon, or security interests in, the property of any of such corporations shall be impaired by such merger or consolidation.[6]
Thus, in a statutory merger, all of the liabilities of a former corporation attach to the surviving corporation. See Baker v. National State Bank, 161 N.J. 220, 228, 736 A.2d 462 (1999) (holding that proof of a merger was sufficient to establish successor liability under N.J.S.A. 14A:10-6(e)); Vega v. Standard Machinery Co., 290 N.J.Super. 434, 440-41, 675 A.2d 1194 (App.Div.1996) (holding that a wholly owned subsidiary merged into its parent ceases to exist and its liabilities become the obligation of the surviving parent under N.J.S.A. 14A:10-6(e)); Brotherton v. Celotex Corporation, 202 N.J.Super. 148, 153-55, 493 A.2d 1337 (Law Div.1985) (holding in an asbestos-related personal injury action that the effect of N.J.S.A. 14A:10-6(e) is to impose liability on a successor corporation for any obligation incurred by its predecessorincluding claims of punitive damagesso long as a merger took place); Department of Transp. v. PSC Resources, Inc., 175 N.J.Super. 447, 453, 419 A.2d 1151 (Law Div.1980) (holding that a purchasing corporation is liable for claims against a company that it acquired if the acquisition was in the form of a statutory merger or consolidation); Wilson v. Fare Well Corp., supra, 140 N.J.Super. at 485, 356 A.2d 458 (holding that liability may be imposed upon a corporation when there has been a merger or consolidation, and a "de facto merger or consolidation will also operate to impose liability"). More recently, we described the effect of a merger in Vega v. Standard Machinery Co., supra:
A merging of two corporations "contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain" as the surviving corporation pursuant to the plan of merger. Applestein v. United Bd. & Carton Corp., 60 N.J.Super. 333, 342, 159 A.2d 146 (Ch.Div.) aff'd, 33 *939 N.J. 72, 161 A.2d 474 (1960). By operation of law, all property, both real and personal, belonging to each of the merging corporations becomes vested in the surviving corporation, without any further act or deed. N.J.S.A. 14A:10-6(d). Thus, title passes automatically upon the filing of the certificate of merger in the Office of the Secretary of State. N.J.S.A. 14A:10-4.1(2). No price is paid. Consideration does not pass between the surviving parent corporation and its wholly-owned subsidiary, which is absorbed. Its existence ceases, N.J.S.A. 14A:10-6(b), and its liabilities become the obligation of the surviving parent. N.J.S.A. 14A:10-6(e).
[Vega, supra, 290 N.J.Super. at 440-41, 675 A.2d 1194.]
The imposition of liability on the surviving corporation simply recognizes the merger transaction for what it isa corporate readjustment of existing interests devoid of any element of consideration. C & A is merely a "new hat" of Wickes. On this score, C & A and Wickes were neither strangers nor unrelated prior to their merger. On the contrary, these companies were vertically integrated within the same corporate structure. Indeed, pre merger, Wickes's namesake, Collins & Aikman Group, Inc., wholly owned C & A. And there is no evidence in this case of any change of ownership or management after the merger or, as noted earlier, any transfer of consideration. Rather what occurred here appears to be simply a change in the manner and form of carrying on the same business by the same persons. Thus, viewed either way, as a statutory merger or corporate restructuringthe essential identity and unity of the two companies warrants the imposition of a duty on C & A to respond to complaints arising from products manufactured by Wickes.
Because we have decided that C & A is not a "successor," the holding of Ramirez that successor corporations are not liable unless they continue the offending product line is simply not applicable here. Thus, in finding that discontinuation of the product line was the sole controlling determinant of non-liability in this case, the trial court misapplied the Ramirez holding, which actually expanded successor liability rules by extending them to cases that do not satisfy the traditional exceptions. See Ramirez v. Amsted Industries, Inc., supra, 86 N.J. at 350, 431 A.2d 811; Brotherton v. Celotex Corporation, supra, 202 N.J.Super. at 158-59, 493 A.2d 1337.
To the traditional rule of corporate successor non-liability,[7] there had developed in this State, pre-Ramirez, four judicially created exceptions:
(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or de facto consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability.
Lefever, supra, 160 N.J. at 310, 734 A.2d 290 (citing 15 William & Fletcher, Cyclopedia of the Law of Corporations § 70, 122 nn. 9-15 (1990)). See also Ramirez, supra, 86 N.J. at 340-41, 431 A.2d 811. "A fifth exception sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer." McKee v. Harris *940 Seybold Co., 109 N.J.Super. 555, 561, 264 A.2d 98 (Law Div.1970), aff'd 118 N.J.Super. 480, 288 A.2d 585 (App.Div. 1972); Ramirez, supra, 86 N.J. at 341, 431 A.2d 811. Because "[s]trict interpretation of the traditional corporate law approach leads to a narrow application of the exceptions to nonliability, and places unwarranted emphasis on the form rather than the practical effect of a particular corporate transaction," Ramirez, supra, 86 N.J. at 341-42, 431 A.2d 811, our Supreme Court in Ramirez, as a matter of public policy, adopted a product line exception to the general rule of non-liability. Id. at 349-53, 431 A.2d 811.[8] Thus, where none of the other five exceptions was sufficient for imposing liability on the purchasing corporation, the Ramirez Court determined it nevertheless fair to impose corporate successor liability as well in the circumstance of "continuity in the manufacturing of the... product line ..." Id. at 350, 431 A.2d 811.
[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing operation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.
[Ramirez, supra, 86 N.J. at 358, 431 A.2d 811.]
Thus, Ramirez broadened traditional successor liability where the successor company did not satisfy the more rigorous standards underlying other bases for corporate liability. So, for example, even if the successor company did not qualify under the more exacting "mere continuation" exceptionin terms of sharing common ownership, management, and personnel among other factorsRamirez extended successor liability to companies continuing the actual manufacturing operation of the seller, without requiring any further nexus or connection to the predecessor manufacturing company. In other words, where commonality of ownership and management cannot be shown, corporate successor liability may nevertheless rest on continuity of the "enterprise" of the predecessor corporation.
Ramirez, however, may not be read, as did the trial court, to suggest that an existing manufacturer is immune from liability after its sale of the alleged offending product line simply because a plaintiff's injury did not occur while the original manufacturer was actually engaged in the manufacturing operation. See Nieves, supra, 86 N.J. at 371, 431 A.2d 826; Pacius v. Thermtroll Corporation, 259 N.J.Super. 51, 611 A.2d 153 (Law Div.1992). Indeed, such a restrictive view of Ramirez would be contrary to the liberalizing effect its holding has had on recovery for plaintiffs otherwise left remediless against a defunct corporation. Ramirez, supra, 86 N.J. at 350, 431 A.2d 811; Brotherton v. Celotex Corp., supra, 202 N.J.Super. at 158-59, 493 A.2d 1337. Stated otherwise, by creating the product-line exception, Ramirez expanded plaintiffs' recourse against successor corporations, but not to the exclusion of remedies against predecessor companies that remain extant and viable and therefore liable.
*941 In summary, the liability sought to be imposed in this case is directnot vicariousin recognition of the fact that despite the spin-off of its machinery manufacturing subsidiary, the several name changes, the emergence from bankruptcy, and the eventual collapse of the parent into its subsidiary corporation, Wickes and C & A share a common identity and remain the same entity. Since the original manufacturer, albeit reconstituted, is in effect extant and viable, neither Ramirez nor the traditional approach to corporate successor non-liability applies.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] According to the Stock Purchase Agreement Section 6.9, which contains the "Allocation of Company Liabilities," Wickes was to be responsible for all known, scheduled product liability claims against the Wickes Machine Tool Group, Inc. Furthermore, SMS was to assume responsibility for all unknown claims or liabilities of the company that arose prior to or after the closing date, subject to certain limitations that are addressed in the section.

Wickes agreed to pay the first $150,000, in aggregate, of unknown claims resulting from acts or failures to act prior to the closing date. SMS agreed to be responsible for all other claims. In 1986, the Stock Purchase Agreement was amended, and Wickes forgave SMS a substantial portion of the remaining purchase price in exchange for SMS's relieving Wickes of nearly all of Wickes' remaining obligations under the 1983 Stock Purchase Agreement.
In a lawsuit filed by another individual injured while operating a Kux diecasting machine, the same defendants as involved hereC & A, SMS and Saginawfiled cross-claims against each other for defense and indemnification, each contending that the other is primarily responsible for the liabilities of the former Kux Machine Division and the defense of that action. On cross-motions for summary judgment, the Federal District Court held that SMS and Saginaw had a duty to defend and indemnify C & A in that lawsuit. Ramos v. Collins & Aikman Group, Inc., 977 F.Supp., 537, 539-40 (D.Mass.1997). We have relied on the factual background recited in that case since the parties here are in agreement therewith.
[2] The court denied summary judgment for defendants Saginaw and SMS, finding that factual issues existed concerning their liability as successor corporations and for any duty to warn.
[3] In granting summary judgment to defendant C & A, the court also found that C & A was not liable, as a matter of law, under the theory of a post-manufacture duty to warn. Plaintiff does not appeal this aspect of the lower court's grant of summary judgment.
[4] Justice Schreiber, in his concurring opinion in Ramirez stated that "[t]he central thesis of this [successor corporation liability] methodology is premised on the elimination by the successor of an effective remedy. That is an essential condition precedent to recovery." Ramirez, supra, 86 N.J. at 358, 431 A.2d 811. The Court's concern was not as much with "the availability of one particular viable successor as it was with the unavailability of the original manufacturer by reason of its divestiture of assets and dissolution." Nieves v. Bruno Sherman Corp., 86 N.J. 361, 370-71, 431 A.2d 826 (1981).
[5] All parties agree that both laws are based on the Model Business Corporation Act, Model Bus. Corp. Act, §§ 1.01-16.22 (1984), and are virtually identical. We refer to New Jersey law in the text because there is no conflict and all parties cited only New Jersey law in their briefs and at oral argument.
[6] Similarly, under Delaware's General Corporation Law, "all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to ... [the] surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." Del.Code Ann., tit. 8, § 259 (2000). See Beals v. Washington Int'l, Inc., 386 A.2d 1156 (Del.Ch.1978) (holding that a corporation into which another corporation was merged is liable for all debts, liabilities, and duties of the merged corporation.).
[7] Generally, when a company sells its assets to another company, the acquiring company is not liable for the selling company's debts and liabilities simply because it has succeeded in ownership to the seller's assets. Lefever v. K.P. Hovnanian Enterprises, Inc., supra, 160 N.J. at 310, 734 A.2d 290.
[8] The justifications for the product-line exception include the public interest "of spreading the risk to society at large for the costs of injuries from defective products" and attaching the burden necessary "to [the successor's] enjoyment of [the original manufacturer's] trade name, good will and the continuation of an established manufacturing enterprise." Ramirez, supra, 86 N.J. at 350, 352, 431 A.2d 811.