### In re RELATED ASBESTOS CASES.

### No. C–79–3588 RFP.

United States District Court,
N.D. California.

June 30, 1983.

---

John Gigounas, Law Offices of John Gigounas, San Francisco, Cal., Kenneth Carlson, Law Offices of Kenneth Carlson, Oakland, Cal., for plaintiffs.

John Dickerson, Phillip S. Berry, Berry & Berry, Oakland, Cal., for defendant Celotex Corp.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

In these asbestos-related personal injury cases, plaintiffs seek recovery of punitive damages against various defendants, including the Celotex Corporation, the moving party herein. The alleged punitive damage liability of Celotex is premised upon the activities of a predecessor corporation. Celotex, in this motion for partial summary judgment, seeks a ruling from this court that there exists no genuine issue of material fact concerning such purported liability. In support of its motion, Celotex advances two basic arguments. First, it asserts that, under California law, punitive damages can be imposed upon a successor corporation only if said successor is so similar to its predecessor as to be indistinguishable. Second, it urges that the imposition of punitive damages in industry-wide mass tort litigation is both contrary to law and unconstitutional.

## I. FACTUAL BACKGROUND

The Phillip Carey Manufacturing Company ("Old Carey") was incorporated in Ohio in 1888. Through a public offer for tenders in February of 1966, and through subsequent open market purchases, Glen Alden Corporation acquired approximately 28% of the outstanding shares of Old Carey.

On December 1, 1966, a new corporation was formed in Ohio. It was named P.C. Company, Inc., but to resolve a conflict of name, its Articles of Incorporation were amended to change the name to XPCU Corporation on April 14, 1967. Subsequently, the name of the corporation was changed as of June 1, 1967, to the Phillip Carey Manufacturing Company ("New Carey").

On June 1, 1967, Old Carey was merged into Glen Alden in a transaction by which the other shareholders of Old Carey received a Preferred Stock of Glen Alden. Immediately after the merger, Old Carey transferred all its assets subject to liabilities to Glen Alden, and Glen Alden transferred to New Carey all the assets of Old Carey, subject to its liabilities, in exchange for all the outstanding shares of capital stock of New Carey. Thus, New Carey became a wholly owned subsidiary of Glen Alden.

On January 23, 1968, The Phillip Carey Manufacturing Company changed its name to Phillip Carey Corporation. On April 9, 1970, Phillip Carey Corporation was merged into Briggs Manufacturing Company. On the same date, Briggs, the surviving company, changed its name to Panacon Corporation. Panacon Corporation succeeded to all the assets and liabilities of Phillip Carey Corporation, which ceased to have corporate existence. After April 9, 1970, Panacon continued to operate "Phillip Carey" and/or "Phillip Carey Company" as a division which manufactured and sold roofing and insulation materials but which had no separate corporate or legal existence.

On April 17, 1972, Celotex Corporation purchased all the Panacon Corporation stock held by the Glen Alden Corporation, approximately 75%, for cash. The Glen Alden Corporation did not acquire any shares of Celotex stock as a result of that transaction; nor did Glen Alden acquire any share of the stock of Jim Walter Corporation, Celotex's parent corporation, as a result of that transaction.

Subsequently, Celotex offered to buy all remaining outstanding shares of Panacon Corporation from their respective owners for $6.00 per share. As a result of these transactions, Celotex bought all shares of the Panacon Corporation for cash, and no stockholders of the former Panacon Corporation became stockholders in Celotex or in any of Celotex's parent or subsidiary corporations. Celotex succeeded to all the assets and liabilities of Panacon, which ceased to have corporate existence.

Celotex, after June 30, 1972, continued to operate "Phillip Carey" as a division which manufactured and sold roofing and insulation materials but had no separate corporate or legal existence. This practice ceased at the end of 1973.

## II. DISCUSSION

### A. Constitutionality/Illegality of Punitive Damages

On June 2, 1982, this court issued an order addressing these issues. Therein we held that the questions of the illegality/unconstitutionality *vel non* of punitive damages in mass product liability litigation were not suitable for pretrial resolution in light of the possibility that the plaintiffs would be unable to establish a *prima facie* case of liability for punitive damages, rendering the issues moot. Hence, we denied without prejudice the defendants' motion to strike plaintiffs' prayer for punitive damages. This order applied to all related asbestos cases falling within the *In Re Related Asbestos* rubric, in which the present cases are to be included. This action is therefore controlled by the June 2 order. Neither Celotex nor the plaintiffs offer new legal authority for their respective positions. We therefore adhere to our previous ruling.

## B. Successor Liability

Pursuant to California Civil Code § 3294(a), a plaintiff may recover punitive damages where a defendant has been guilty of "oppression, fraud, or malice." The purpose of punitive damages is to punish wrongdoers and to deter the further commission of wrongful acts. *Egan v. Mutual of Omaha Insurance Co.,* 24 Cal.3d 809, 825, 169 Cal.Rptr. 691, 620 P.2d 141 (1979). In light of this purpose, punitive damage liability is not imposed on the basis of vicarious fault; California courts have recognized that punitive damages "will have no deterrent effect if awarded against a party not responsible for the wrong. (4 Witkin, *Summary of California Law,* 1974, Torts, § 855, p. 3147)." *Hartman v. Shell Oil Co.,* 68 Cal.App.3d 240, 249, 137 Cal.Rptr. 244 (1977).

Punitive damage liability may be imposed upon a successor corporation under three possible theories: 1) under the doctrine of *Ray v. Alad Corp., infra;* 2) under the principles embodied in *Moe v. Transamerica Title Insurance Co., infra;* 3) by analogy to section 3294(b), that is, on the basis of the principal's knowledge, authorization or ratification of an agent's malicious act.

### 1. *Ray v. Alad Corp.*

California, whose law is applicable in these diversity cases, adheres to the general rule that a corporation which purchases the principal assets of another corporation does not assume the latter's liabilities unless:

1) there is an express or implied agreement of assumption;

2) the transaction amounts to a consolidation or merger of the two corporations;

3) the purchasing corporation is a mere continuation of the seller;

4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts.

*Ray v. Alad Corp.,* 19 Cal.3d 22, 28, 136 Cal.Rptr. 574, 560 P.2d 3 (1977). In *Ray v. Alad,* the Court found that the successor therein did not fall within any of the four aforementioned exceptions; however, the Court held that the policies underlying strict tort liability for defective products called for a special exception to the general rule. The Court noted that the purpose of the doctrine of strict products liability "is to insure that the costs of injuries be borne by the manufacturers that put such products on the markets rather than by the injured persons who are powerless to protect themselves." *Id.* at 30, 136 Cal.Rptr. 574, 560 P.2d 3. The doctrine rests upon the proposition that the risk of injury can be insured against by the manufacturer and spread amongst the consuming public as a cost of doing business. In light of these principles, the court concluded that strict liability could justifiably be imposed upon the successor to a manufacturer where 1) the plaintiff's remedies against the original manufacturer are effectively destroyed by the successor's acquisition of the business; 2) the successor is able to assume the original manufacturer's risk-spreading role; and 3) it is fair to require the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of its business. *Id.* at 31, 136 Cal.Rptr. 574, 560 P.2d 3.

Under the facts of that particular case, the Court determined that the successor manufacturer could be held liable for injuries resulting from its predecessor's products. The plaintiff had been injured while using a defective ladder manufactured by the first Alad Corp. (Alad I). Prior to plaintiff's injury, Alad I had sold its inventory, equipment, trade name and good will to the Lighting Maintenance Corporation, which then took the name "Alad Corporation" (Alad II). Alad I dissolved shortly thereafter. Alad II, as a result of the transaction, acquired Alad I's plant, machinery, offices, and all other assets necessary to continue the manufacture of Alad ladders. Alad II, using essentially the same factory and office personnel, and continued to manufacture the identical model of ladder which had injured the plaintiff. There was little or no indication to the general

public that a different entity was manufacturing the line of ladders.

In *Rawlings v. D.M. Oliver,* 97 Cal.App.3d 890, 159 Cal.Rptr. 119 (1979), the California Court of Appeal broadened *Ray v. Alad* to impose liability for a defective product upon a successor who merely continued the same general line of business although not the identical product. The Ninth Circuit has commented that

> The rationale of *Ray v. Alad Corp.* [and *Rawlings* ] is consistent with California's strict liability policy of assigning responsibility for injuries arising from the manufacture of defective products to the enterprise which has received the benefit of doing business in a particular line of products, and which is in the best position to spread the cost of the injury among members of society.

*Gee v. Tenneco, Inc.,* 615 F.2d 857, 864 (9th Cir.1980).

Both *Ray v. Alad* and *Rawlings* imposed liability for compensatory damages upon successor companies. Neither case purported to extend the above principles to claims for punitive damages. Assuming, *arguendo,* that Celotex would be liable for compensatory damages, we conclude that California would not expand the reach of the above cases to hold Celotex liable for punitive damages under the present circumstances. The justifications underlying successor liability for compensatory damages articulated in *Ray v. Alad* simply are not present in the instant case. Punitive damages are not a part of a plaintiff's remedies for harm suffered, which *Ray v. Alad* feared would be destroyed unless a successor corporation were held liable. Punitive damages serve only to punish and deter the wrongdoer. Unlike compensatory damages, punitive damages provide a windfall to a plaintiff. If a plaintiff is unable to recover punitive damages, he will not suffer unrectified injury.

Moreover, the assets of a successor corporation could arguably suffer such serious depletion as a result of punitive damage suits, that the corporation would be unable to provide compensatory damages to future plaintiffs genuinely in need of monetary recovery. This danger, and the problems generally posed by the imposition of punitive damage liability in multiple-plaintiff products liability litigation, have troubled numerous courts. *See Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 838–41 (2d Cir.1967); *Rosener v. Sears, Roebuck & Co.,* 110 Cal.App.3d 740, 758–59, 168 Cal.Rptr. 237 (1980) (Elkington, J., concurring).

Furthermore, Celotex cannot easily assume a risk-spreading role. The probability and amount of punitive damages would be extremely difficult to anticipate, and, moreover, California law does not permit insurance coverage to include liability for punitive damages. Cal. Insurance Code § 533 provides:

> An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.

In *City Products Corp. v. Globe Indemnity Co.,* 88 Cal.App.3d 31, 151 Cal.Rptr. 494 (1979), the court noted that, under California law, a corporation may be liable for punitive damages only for malicious acts done by its agents and with the knowledge or under the direction of its corporate officers having the power to bind the corporation. *Id.* Therefore, the court stated,

> It is apparent from the foregoing that under California law the imposition of punitive damages upon a corporation is based upon its own fault. It is not imposed vicariously by virtue of the fault of others.

*Id.* at 36, 151 Cal.Rptr. 494. Because the corporation was assessed punitive damages on the basis of its *own* wilful acts, insurance coverage was prohibited by section 533. The court explained further that, unlike jurisdictions which permit punitive damages on the basis of gross negligence or reckless or wanton conduct, California limits punitive damages to cases involving fraud, oppression or malice; the latter jurisdictions have generally invalidated insurance coverage for punitive damages on policy grounds. California, the court found,

fell into this category. Thus, in California, indemnification for punitive damage liability is violative of public policy.

Finally, the successor has sufficiently assumed the "burden" which "runs" with its enjoyment of the predecessor's goodwill when it is rendered liable for the product's defectiveness. Furthermore, if the predecessor's malice become apparent or publicized, the successor will have received less value for its original purchase price than it anticipated.

■ In light of the foregoing, we doubt that California would choose to *expand* the aegis of punitive damage liability in the context of mass product liability litigation. We therefore conclude that the fact that Celotex has continued several of the Carey product lines does not raise a material issue of fact sufficient to resist summary judgment on the punitive damage issue.

### 2. *Moe v. Transamerica Title Insurance Company*

■ California law has been quite restrictive in identifying those to be deemed "responsible for the wrong," within the meaning of 3294(a), finding a successor corporation liable for punitive damages only when the predecessor and successor are effectively one and the same entity. In *Moe v. Transamerica Title Insurance Company,* 21 Cal.App.3d 289 98 Cal.Rptr. 547 (1971), the court held a successor corporation liable for the fraudulent conduct of an employee of the predecessor corporation. In *Moe,* however, the successor/defendant made no attempt to establish its separateness from the original entity. Hence, the court concluded that:

> The record shows that in its answer to the complaint, appellant Transamerica designated itself as "Transamerica Title Insurance Company, a corporation, formerly known as City Title Insurance Company." Elsewhere in the answer, it was admitted that defendant Olsen was an employee and assistant secretary of "City Title Insurance Company, also known as Transamerica Title Insurance Company." Clearly, appellant Trans-

america made no attempt in the trial court to contend that it was a corporation separate and distinct from City Title or that it was subject to a different standard of liability. To the contrary, the above-quoted portions of the answer are, in effect, admissions that the two corporations are one and the same.

*Id.* at 304, 98 Cal.Rptr. 547.

In the instant case, defendant has demonstrated that it is not a mere continuation of Carey. Celotex was an ongoing concern when it purchased the stock of its predecessor. Thereafter, it continued to operate with its former board of directors. *See* Agreement and Plan of Merger at 3. The officers of Celotex in office upon the effective date of the merger were to continue as the officers of the surviving corporation. *Id.* at 4. None of the predecessor-shareholders became shareholders of Celotex. Declaration of Turbiville at 1. Defendant has therefore adduced sufficient evidence to distinguish itself from the situation and principles embodied in *Moe.*

Moreover, the agent/employee responsible for the culpable conduct in *Moe* apparently continued to be employed by Transamerica, the successor. In this case, plaintiffs have proffered no evidence that *culpable* and responsible officers of the predecessor corporations continued to be employed by Celotex. Plaintiffs contend that they "*plan to* introduce evidence to establish how the corporate changes occurred, that certain key employees continued to work for Celotex after the acquisition, and that Celotex continued manufacturing many of the same product lines of .its predecessors." Plaintiffs' Mem. P. & A. at 3 (emphasis added). However, in order to defeat a motion for summary judgment, plaintiffs must produce sufficient evidence to raise a triable issue of fact *now;* they are not entitled to a denial of the motion "upon the unsubstantiated hope that [they] can produce such evidence at trial." *Cermetek, Inc. v. Butler Avpak, Inc.,* 573 F.2d 1370, 1377 (9th Cir.1978).

In support of their position, plaintiffs offer the declaration of Lewis Pechstein, who joined Phillip Carey in 1955 and remained

in the employ of the various successors thereafter, to be elected secretary of Celotex in 1977. However, Mr. Pechstein, as secretary, cannot be considered, solely by virtue of his position, a culpable and responsible officer. By his deposition testimony, his duties and responsibilities at Celotex required him to safekeep its records and contracts, to handle the minutes of the meetings of the sole shareholder and the Board of Directors, and to prepare and review numerous contracts involving the corporation. From 1966 to 1972, his duties as secretary of New Carey and Briggs/Panacon were essentially the same as those just outlined. From 1956 to 1966, as assistant secretary of Old Carey, Mr. Pechstein merely assisted the secretary in carrying out the above duties. Deposition of Pechstein at 45. Mr. Pechstein was never a member of the Board of Directors of Old Carey. *Id.* at 46. Although Mr. Pechstein first became aware of a health hazard associated with asbestos in 1958, when one of the plant workers filed a worker's compensation claim asserting asbestosis, this fact—in light of Mr. Pechstein's position and in the absence of supportive or explanatory facts—does not itself create an issue of material fact.

Mr. Pechstein stated further that in 1967 the vice-president of sales for Old Carey was Elmo A. DiSalvo, who is now, he asserted, the vice-president of the Celotex Corporation and president of one of the roofing divisions. *Id.* at 24–25. Arthur Mueller, who was involved in the 1969 decision-making process to eliminate asbestos from the formulation for high temperature insulation, and who worked for both Old and New Carey—not as an officer, but with some responsibility for formulation, manufacture and quality control—is still with Celotex. *Id.* at 28–29. Again, these bare facts do not suggest that either individual was guilty of egregious conduct nor, more importantly, that Celotex was an entity indistinguishable from Old or New Carey, under *Moe,* merely because it retained several individuals who possessed experience and expertise.

Although they have had ample opportunity to do so, plaintiffs have failed to offer additional declarations of these or other purportedly "key" employees or officers. The mere fact that several employees of Carey continue to be employed by Celotex is not significant or material, unless there is affirmative evidence—or a reasonable inference—that they were responsible for any egregious conduct of the predecessor corporation. Nor is the simple fact that Celotex continues to produce some asbestos-related products sufficient to resist summary judgment, in light of our refusal to extend *Ray v. Alad* to encompass the instant claim for punitive damages. There is no evidence, finally, that Celotex is *perpetuating* the allegedly malicious conduct that would have warranted the imposition of punitive damages against a predecessor.

**3. Section 3294(b)**

■ Section 3294(b) provides:

An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge, ratification, or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

In *Hale v. Farmers Insurance Exchange,* 42 Cal.App.3d 681, 117 Cal.Rptr. 146 (1974), *overruled on other grounds, Egan, supra,* 24 Cal.3d at 822 n. 5, 169 Cal.Rptr. 691, 620 P.2d 141 the court stated that:

California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can properly be awarded against a principal because of an act of an agent if, but only if "(a) the principal authorized the doing and the manner of the act, or (b) the agent was

unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting within the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act."

"Although there has been no fault on the part of a corporation or other employer, where a person acting in a managerial capacity either does an outrageous act or approves of such an act by a subordinate, the imposition of punitive damages upon the employer serves as a deterrent to the employment of unfit persons for important positions." Rest. Torts, § 909, comment (a).

*Id.* 42 Cal.App.3d at 691, 117 Cal.Rptr. 146. Where the employee follows the company's "usual procedures," the employee's acts may be considered part of employer policy. *Id.* at 695–97, 117 Cal.Rptr. 146. Customary practice may be considered to have been known or authorized by those who dictate the policies of the corporation. *Id.* at 696–97, 117 Cal.Rptr. 146. Otherwise, the evidence must show that the employer personally participated in the wrongful acts, or that he previously authorized them, or subsequently ratified them with full knowledge of the facts. *Id.* at 696, 117 Cal.Rptr. 146. *See also Hartman v. Shell Oil Co.,* 68 Cal. App.3d 240, 137 Cal.Rptr. 244 (1977) (ratification may be express or implied).

Celotex contends that it could not have possessed advance knowledge of any acts by employees of Phillip Carey Corporation eight to ten years prior to Celotex's purchasing one of Carey's successors. Furthermore, it asserts that the former corporation and its officers and employees were not agents of Celotex whose acts it could subsequently ratify. Indeed, section 3294(b) would seem to have, at best, an attenuated applicability to a successor corporation. A corporate employer theoretically possesses the power to control the future conduct of its employees, either by imposition of sanctions for malicious behavior or by dismissal of the culpable employee. Moreover, the employer, upon discovering such outrageous conduct, may have the ability to abrogate or rectify the results thereof. However, if *another* entity or person should subsequently employ the culpable individual, even with awareness of his prior malfeasance, that employer would not, by the mere act of employment, "ratify" that malfeasance and render itself liable therefor.

Celotex has concededly retained several individuals who were employed by Carey. But this fact alone, without evidence of the employees' malicious conduct, without evidence of Celotex's knowledge thereof, and without evidence that Celotex was not a separate and distinct corporate entity, has little meaning and most certainly does not raise a genuine issue of material fact concerning Celotex's "ratification" of such alleged misconduct.

■ As previously noted, the very concept of ratification has an attenuated applicability outside the direct agent-principal relationship; in fact, we are aware of no case authority wherein the concept has been applied in the context of successor corporate liability. We are of the opinion that, in such a context, the concept would be relevant only in the extreme. A corporate employer, whose identity is distinct and separate from its predecessor, should generally be liable only if, with knowledge of the clearly malicious tendencies or recklessness of a predecessor's employee, hires such employee, who subsequently acts in accordance with those propensities. The fault of the successor at that point is personal; it is culpable for having recklessly employed such an individual. This, of course, is not the case before us. We conclude that, under the circumstances, Celotex did not "ratify," within the meaning of section 3294(b), the prior acts of its predecessors' employees. Plaintiff has proffered no evidence or authority to suggest that a material issue of fact to the contrary exists.

Although the law is sparse concerning the issue presently before the court, the few jurisdictions which have addressed the matter have proceeded conservatively. In *Wussow v. Commercial Mechanisms, Inc.,* 97 Wis.2d 136, 293 N.W.2d 897 (Wis.1980), the Court imposed punitive damages against

both the original manufacturer and its acquiring corporation. Commercial Mechanisms, Inc. (CMI) had manufactured a pitching machine, which was sold to Antholone Industries, Inc., which in turn sold the machine to the Bangor Area School District in June of 1970. A young boy was injured by the pitching machine about two years later. The principal evidence which supported the imposition of punitive damage liability was provided by the testimony of an engineer, Arones, employed by both CMI and its purchasing company, Advance.

Arones, although primarily an employee of Advance, spent several days each month at CMI's plant and he was an integral part of both companies' operations. He was an employee of both companies and received compensation from CMI and Advance.

The record shows that, after the acquisition of CMI by Advance in 1971, all the members of the board of directors of CMI were also board members of Advance.... [A]fter the acquisition, [Arones] had general supervision of the pitching machine business conducted by CMI. Although Arones was a vice-president of Advance and had been an employee of Advance since the mid-1930's, he became an employee of CMI, as well as of Advance, following the acquisition.

Arones' testimony revealed that both defendants had actual knowledge of the defective nature of the pitching machine prior to the injury of Ronald Wussow. Arones admitted that he and other employees of CMI and Advance were aware of other injuries and other lawsuits prior to July 3, 1972 ... [and] ... that, although he was aware that there were other injuries, he did not check CMI's safety records upon Advance's acquisition of CMI and he did not urge the installation and manufacture of a safety guard even though he knew that other pitching machines had such guards. His examination also brought out the fact that the safety instructions which were distributed with the machines were misleading and inadequate. Although the testimony made it clear that it would have been prudent to have a formal safety review committee, Arones knew that CMI did not have such a committee.

... At the time of Wussow's injury, CMI was wholly owned by Advance and the pitching machine operation was under the direct control of Arones, a vice president of Advance. During the year between the acquisition of CMI and Wussow's accident, Arones was aware of the hazards inherent in the design of the pitching machine and yet nothing was done by Advance *to insure that prior purchasers of the machine were informed of the hazard. No attempt was made during the period to manufacture or distribute guard devices,* even though Arones acknowledged that the design and manufacture of a guard device was a matter of routine engineering skill and required no design pioneering. The responsibility of Advance and its liability to answer in punitive damages is made clear by the record.

*Id.* 293 N.W.2d at 905–07.

This case differs significantly from *Wussow*. There is no discrete product, the danger of which *Celotex* could have averted by providing warnings to prior purchasers. Plaintiffs have generally been exposed to asbestos dust in the course of their employment during a period of time *which had already passed*. In *Wussow*, the harm could have been *prevented* by the successor company had it made an effort to warn previous customers that the product was dangerous or to supply ameliorative guards. There is no evidence in this case of a key employee such as Arones, who admittedly had both knowledge of the dangers and control over the manufacturing operations and who failed to act upon this knowledge. Nor is the board of director membership the same in the instant case, as it was in *Wussow*. We agree that, on the facts of *Wussow*, the successor corporation was *itself* guilty of outrageous behavior, although the actual product had been manufactured by a predecessor. *Wussow,* however, is clearly distinguishable from the instant case.

In *Drayton v. Jiffee Chemical Corp.,* 395 F.Supp. 1081, *mod. on other grounds,* 591 F.2d 352 (6th Cir.1978), the court refused to impose punitive damages upon a successor corporation. The successor, Chlorox, had acquired the predecessor manufacturer of liquid drain cleaner after the plaintiff's accident. It had immediately reformulated the product to render it safe for home use. The court noted:

> Its efforts in this regard were in direct contradiction to the egregious conduct of the original Jiffee management. Thus, the "outrageous conduct" for which plaintiffs seek retribution is more properly attributed to Jiffee's original management personnel whose attitudes and marketing policies Chlorox, on its own initiative, has successfully purged from the company.
>
> Similarly, the evidence at trial showed that many of the drain cleaners presently on the market are uniformly characterized by safer formulation, crystalline form, and unit packaging thereby avoiding the hazards that contributed to [the plaintiff's] accident. Under these circumstances there would seem to be little deterrent value in inflicting punitive damages on the Jiffee Chemical Corporation. As a general rule punitive damages are disfavored in the law absent evidence of willful or wanton conduct by the defendant or the clear need for their imposition as a deterrent. [citations].

*Id.* at 1098. The instant case resembles that of *Drayton.* Thus, there would seem to be little purpose in punishing Celotex for the prior sins of its predecessors.

Under rule 56(c), F.R.Civ.P., the moving party has the initial burden of demonstrating the absence of a genuine issue of material fact, but if the moving party satisfies this burden, the opponent must come forward with specific facts indicating that a genuine factual issue remains for trial. Rule 56(e). *Feldman v. Simkins Indus., Inc.,* 679 F.2d 1299, 1305 (9th Cir.1982). That evidence must be "significantly probative" as to any allegedly disputed fact. *Id.* In accordance with *Texas Partners v. Conrock Co.,* 685 F.2d 1116, 1119 (9th Cir.1981),

dismissed pursuant to S.Ct. Rule 53, —— U.S. ——, 103 S.Ct. 1281, 75 L.Ed.2d 501 (1983), we have afforded the plaintiffs ample opportunity to proceed with complete discovery. Despite this opportunity, plaintiffs have failed to produce significantly probative evidence material to the legal theories applicable in the instant case.

IT IS THEREFORE ORDERED that the defendant's Motion for Partial Summary Judgment is hereby GRANTED.