**IN THE COURT OF APPEALS OF TENNESSEE,**
**AT JACKSON**

_____

|  |  |  |
|---|---|---|
| **DON L. CULBREATH**, | ) | Shelby Law No. |
|  | ) |  |
| Plaintiff/Counter-Defendant/Appellee, | ) |  |
|  | ) | C.A. No. W1998-00426-COA-R3-CV |
| VS. | ) |  |
|  | ) |  |
| **FIRST TENNESSEE BANK** | ) |  |
| **NATIONAL ASSOCIATION**, | ) |  |
|  | ) |  |
| Defendant/Counter-Plaintiff/Appellant. | ) |  |
|  | ) |  |

**FILED**

**January 19, 2000**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____
_____

From the Chancery Court of Shelby County at Memphis.
**Honorable Floyd Peete, Chancellor**

**Leo Bearman, Jr.**,
**John C. Speer**,
**Michael C. Patton**,
BAKER, DONELSON, BEARMAN & CALDWELL, P.C., Memphis, Tennessee
Attorneys for Defendant/Counter-Plaintiff/Appellant

**Seymour Rosenberg**,
LAW OFFICES OF SEYMOUR S. ROSENBERG, Memphis, Tennessee
**R. Sadler Bailey**,
**Andrew M. Clarke**,
**C. Philip M. Campbell**,
BAILEY & CLARKE, Memphis, Tennessee
Attorneys for Plaintiff/Counter-Defendant/Appellee

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

       This cause of action stems from the events leading to the execution of a $150,000 loan and the assignment of a deed of trust to secure the loan. In the bifurcated trial below, the trial court entered judgment against the defendant for $209,156 in compensatory damages and $9 million in punitive damages. We affirm the award of compensatory damages and reverse the award of

punitive damages.

The plaintiff, Don Culbreath (hereinafter "Culbreath"), was the president of Southern Wholesale Motors, Inc. (hereinafter "Southern Motors"), an automobile wholesale business located in Shelby County, Tennessee. In connection with the operation of his business, Culbreath maintained two lines of credit with the Community First Bank, f/k/a Community Bank of Germantown (hereinafter "Community First"). One line of credit in the amount of $300,000 was used for floor plan financing, and Community First had a security interest in the vehicles that Southern Motors owned.

Southern Motors also maintained another line of credit for $150,000 which was used for immediate financing. Under their agreement, Community First would grant immediate credit to Southern Motors under the line of credit when Southern Motors deposited bank drafts for vehicle payments into its checking account. The drafts were secured by the automobile and the automobile title that was enclosed with the draft. When the drafts were paid, the proceeds were deposited into the credit line account. However, if the drafts were not paid within a certain time or were returned unpaid, the checking account was debited by the amount of the draft. Culbreath personally guaranteed all of Southern Motors' indebtedness to Community First as well as the indebtedness of Culbreath's other companies.

In June 1990, Community First canceled Culbreath's $150,000 line of credit because a large number of bank drafts had been returned unpaid. As was its past practice, Community First charged all outstanding drafts against the checking account, resulting in an overdraft of $134,000.[1] Also at that time, the $300,000 line of credit was fully extended.

In order to raise sufficient funds to repay overdrafts, Culbreath and Community First agreed that the bank would loan Culbreath $150,000 so that Culbreath could use his own funds to write future drafts. For collateral to secure the note, Culbreath agreed to pledge a parcel of property located on Brooks Road in which Culbreath owned a one-half interest. Community First agreed to take a third mortgage on the property.

On July 2, 1990, Culbreath and Community First closed the loan. The loan was made

---

[1]Culbreath was convicted of bank fraud in violation of 18 U.S.C. § 1344 in connection with three of the returned drafts. That conviction was affirmed on appeal. *United States v. Culbreath*, 99 F.3d 1140 (6th Cir. 1996).

to Southern Investment Group, Inc., another of Culbreath's companies. Culbreath executed a demand note for $150,000, and Culbreath and his wife executed a "Consent to Pledge" and assigned a deed of trust to the Brooks Road property to Community First. In the Consent to Pledge, the Culbreaths agreed that the Brooks Road property would be "security for any and all indebtedness of the Borrower" to Community First.

Soon after closing on the July 2 loan, Community First determined that it would be better to extend the loan proceeds directly to Southern Motors. Therefore, Culbreath and his wife executed a second set of documents. The demand note and consent to pledge were changed so that "Southern Wholesale Motors, Inc.," was substituted in place of "Southern Investment Group, Inc." All parties agreed to the changes as is evidenced by the initials of the Culbreaths and Jim Lampley, the Community First officer in charge of the loan. The Culbreaths also executed a new deed of trust as to the Brooks Road property.

Despite its representations, Community First did not advance the $150,000 as promised. Instead, Community First added the Brooks Road property as collateral on Culbreath's existing indebtedness with the bank.

By November 1990, Southern Motors had repaid the $134,000 in overdrafts. Nonetheless, Community First did not release the deed of trust on the Brooks Road property, and the bank demanded full payment of the remaining $171,000 in outstanding indebtedness on the $300,000 credit line. When Culbreath could not pay, Community First initiated foreclosure proceedings, which forced Culbreath to file for bankruptcy.

Culbreath filed the present lawsuit in June 1992 against Community Bank of Germantown, Jack Lampley and Rowe Belcher. Culbreath subsequently filed on December 14, 1992, a motion for injunction against the named defendants in order to prevent the bank from foreclosing on the Brooks Road property. In January 1993, the trial court entered a consent order in which the parties agreed to hold in abeyance foreclosure upon Culbreath's payment of $2500. In the consent order, the parties also agreed that Community First would not foreclose on the Brooks Road property as long as Culbreath paid Community First $7500 per month, which was to be used to retire the indebtedness owed to Community First. The consent order enjoined Culbreath from interfering with the foreclosure proceedings in the event he defaulted on his obligations under the consent order. In fact, Culbreath stopped making payments in February 1993, and Community First reinstituted foreclosure proceedings. The trial court denied Culbreath's petition for a second

3

injunction.

Culbreath again sought bankruptcy protection. In November 1993, Culbreath sold a fifty percent (50%) interest in the Brooks Road property to his business partner, Jim Altman. Altman thereafter bought the deed of trust from Community First for $100,000, which stopped the foreclosure. Community First applied the $100,000 to the outstanding indebtedness due on the $300,000 line of credit, and on November 23, 1993, Community First released the deed of trust encumbering the Brooks Road property. As of November 26, 1993, Southern Motors and the Culbreaths owed Community First $83,429.14 on the $300,000 line of credit.

In February 1995, during the pendency of the lawsuit, First Tennessee Bank National Association acquired Community First through a merger. At the time of the merger, Community First had a net worth of $21 million and First Tennessee had a net worth of $880 million.

Following a bifurcated trial, the trial court entered an order of judgment on August 25, 1997, awarding Culbreath compensatory damages of $209,156 against First Tennessee, as successor to Community First. The court found for First Tennessee on its counterclaim against Don and Evie Culbreath and awarded First Tennessee a judgment against the Culbreaths for $60,000, which represented an outstanding deficiency balance on one of the lines of credit. On March 30, 1998, the trial court conducted the punitive damages phase of the trial, and on July 31, 1998, the trial court entered a judgment awarding Culbreath $9 million in punitive damages against First Tennessee.

First Tennessee filed a motion to alter or amend the judgment, which the trial court denied on July 31, 1998. First Tennessee timely filed a notice of appeal on August 25, 1998, and the cause is properly before this Court for consideration.

On appeal, First Tennessee has raised two issues: (1) whether the trial court erred in awarding Culbreath $209,156 in compensatory damages based upon a finding that Community First committed fraud, and (2) whether the trial court erred in awarding Culbreath $9 million in punitive damages. We first address the issue of compensatory damages.

In order to sustain a cause of action for fraudulent misrepresentation, the plaintiff must show that: (1) the defendant made a misrepresentation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) the

4

plaintiff reasonably relied on the misrepresented material fact; and (6) the plaintiff suffered damages as a result of the misrepresentation. *Metropolitan Gov't v. McKinney*, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992). *See also Graham v. First Am. Nat'l Bank*, 594 S.W.2d 723, 725 (Tenn. Ct. App. 1979).

First Tennessee maintains that the trial court erred in finding that Jack Lampley, a Community First officer, stated that a new money loan would be made. The trial court stated in its judgment that Community First "promised [Culbreath] a new loan and intentionally did not fund it, obtaining a third mortgage at closing and attempting a foreclosure of the property in 1991 and again in 1993." Conversely, First Tennessee contends that Community First never intended to make a new money loan, but instead merely sought additional collateral to secure the existing indebtedness.

Upon review, we conclude that the evidence does not preponderate against the trial court's finding that Community First promised Culbreath that it would make a new loan for $150,000 and that Community First later refused to advance the proceeds. Evidence in the record establishes that Culbreath, on behalf of Southern Wholesale Motors, signed a demand note in which he stated, "I/We promise to pay to the order of COMMUNITY BANK OF GERMANTOWN ONE HUNDRED FIFTY THOUSAND AND NO/100 ($150,000.00) Dollars." That note was secured by a simultaneously executed deed of trust which expressly stated on its face, "MAXIMUM PRINCIPAL INDEBTEDNESS FOR TENNESSEE RECORDING TAX PURPOSES IS $150,000.00."

Jack Lampley testified at trial that he never intended to make a new loan to Culbreath and that he never discussed the possibility of making him a new loan to cover the overdrafts. However, that testimony is contradicted by Lampley's own deposition testimony of March 8, 1993, in which he stated that he had discussed the possibility of making a new loan to cover the overdrafts, and by Culbreath's testimony which is consistent with Lampley's March 1993 deposition. Moreover, Mr. Martin Grusin[2] testified that had this transaction been made merely to secure existing debt by means of encumbering additional collateral, the documents would have been drawn differently.

Notwithstanding the foregoing, we believe that it strains logic to conclude that the

---

[2]Mr. Grusin is a licensed attorney practicing in Memphis. He testified that he had experience in business law, taxation, and banking law. In addition, Mr. Grusin is a long-time board member of WBT Holding Company, the parent corporation of United American Bank in Memphis, where Mr. Grusin also serves as chief executive officer.

Brooks Road property was added as additional collateral to secure an existing indebtedness. The deed of trust expressly refers to the simultaneously executed promissory note for $150,000, and it clearly states that the deed of trust secures the promissory note. Therefore, we can safely conclude that the Brooks Road property was encumbered by the deed of trust in the amount of $150,000. At the time of the transactions in question, Culbreath and his companies owed Community First no less than $305,000, which is the sum of the $134,000 in overdrafts plus the outstanding $171,000 debt on the $300,000 line of credit. Evidence submitted at trial established that the Brooks Road property was worth $990,000 and that it was encumbered by two prior mortgages totaling $450,000, leaving some $540,000 in equity against which the owners could borrow. Culbreath owned a one-half interest in the property, which equates to approximately $270,000 in equity against which Culbreath could borrow. However, in spite of the fact that Culbreath and his companies owed Community First at least $305,000, the bank asserts that it only sought to encumber the Brooks Road property for $150,000. Simply stated, the bank maintains that it only sought additional collateral to secure less than half of the outstanding indebtedness in the face of evidence which establishes that the bank could have encumbered the property as additional collateral to secure nearly ninety percent (90%) of the outstanding indebtedness. For the foregoing reasons, we conclude that the evidence does not preponderate against the trial court's finding that Community First committed fraud when it promised to loan Culbreath $150,000 and later refused to fund the loan after obtaining a deed of trust encumbering property owned by Culbreath.

The trial court also found that Culbreath suffered $209,156 in compensatory damages as a result of the fraud perpetrated upon him by Community First. On appeal, First Tennessee contends that Culbreath failed to establish that he suffered damages as a result of fraud. First Tennessee asserts that Culbreath failed to establish a price for the sale of his one-half interest in the Brooks Road property and that Culbreath voluntarily sold his interest in the Brooks Road property, thereby waiving his right to complain about the lack of money received from the sale. Upon review of the evidence presented, we conclude that the trial court correctly determined the amount of compensatory damages.

The Brooks Road property was appraised at $990,000, but had two existing mortgages for $450,000, resulting in $540,000 in equity in the property. Culbreath owned a one-half interest in the property, and his half interest would have been worth approximately $270,000. Culbreath sold his half interest to his business partner, James B. Altman, for $100,000. The quitclaim deed transferring the half interest in the Brooks Road property from Culbreath to Altman states in pertinent part:

6

> I, or we, hereby swear or affirm that to the best of affiants knowledge, information and belief, the actual consideration for this transfer is $100,000.00.

Moreover, two documents from Community First establish that it released the deed of trust in exchange for a $100,000 payment. We therefore conclude that the trial court correctly found that Culbreath sold the property to Altman for $100,000.

First Tennessee also asserts that Culbreath voluntarily sold the property and is thereby estopped from collecting damages as a result of his failure to comply with the consent order. It is undisputed that Community First initiated foreclosure proceedings in September 1991. In response, Culbreath sought bankruptcy protection. On January 5, 1993, the parties entered into a consent order which halted the foreclosure proceedings. When Culbreath did not comply with the terms of the consent order, Community First sought to foreclose on the Brooks Road property.

As has been established, the deed of trust was procured by a fraudulent misrepresentation, and it is therefore void *ab initio*. *Brandon v. Wright*, 838 S.W.2d 532 (Tenn. Ct. App. 1992). Nonetheless, Community First used the fraudulently obtained deed of trust in order to initiate foreclosure proceedings on the Brooks Road property. As a result of the second attempt to foreclose, Culbreath sold his one-half interest in the property to his business partner, James Altman, for $100,000. It can hardly be said that Culbreath's sale of the Brooks Road property under such circumstances was "voluntary" so as to constitute a waiver of his right to seek damages stemming from the sale of the property.

Because Culbreath had a half interest in the property worth $270,000, which he was forced to sell for $100,000, Culbreath sustained damages of $170,000 in loss of equity in the Brooks Road property. In addition to the foregoing, it was proved at trial that Culbreath incurred $38,000 in attorneys' fees as a result of having to defend the foreclosure attempts and that he also paid $1156 in closing costs on the fraudulent loan transaction of July 2, 1990. The sum total of the foregoing compensatory damages is $209,156, which the trial court awarded and which we affirm.

Similarly, we reject First Tennessee's contention that Culbreath is barred from bringing this cause of action because of unclean hands. It is a well-established maxim that he who comes into equity must come with clean hands. As noted over a century ago by our Supreme Court in *C.F. Simmons Medicine Co. v. Mansfield Drug Co.*, 93 Tenn. 84, 23 S.W. 165, 168 (1893):

> The principle is general, and is one of the maxims of the court, that he who comes into a court of equity, asking its interposition in his behalf, must come with clean hands; and if it appears from the case made by him or by his adversary that he has himself been guilty of unconscionable, inequitable, or immoral conduct in and about the same matters whereof he complains of his adversary, or if his claim to relief grows out of or depends upon or is inseparably connected with his own prior fraud, he will be repelled at the threshold of the court.

*See also Continental Bankers Life Ins. Co. v. Simmons*, 561 S.W.2d 460, 465 (Tenn. Ct. App. 1977).

As previously noted, Culbreath was convicted of bank fraud stemming from the sales of three automobiles in 1990. In fact, the fraudulent drafts were only three of many others that were returned to Community First and comprised the $134,000 overdraft. First Tennessee contends that, because of his criminal misconduct in initially creating the overdraft, Culbreath should be prevented from maintaining this lawsuit. We respectfully disagree.

As a practical matter, the overdraft was not created by Culbreath's criminal misconduct. Rather, Culbreath's criminal misconduct created three out of many drafts that were returned to Community First. Eventually, Community First exercised its right and canceled the line of credit, thus creating a $134,000 overdraft. In order to cure the overdraft, Culbreath and Community First entered into a separate loan transaction, which proved to be fraudulent on the part of the bank.

In order to invoke the doctrine of unclean hands, the misconduct must relate directly to the precise transaction which forms the predicate of the complaint. As stated by our Supreme Court in *Chappell v. Dawson*, 308 S.W.2d 420 (Tenn. 1957):

> The doctrine of "unclean hands" when invoked to any suit in equity must relate to the particular transaction which is the subject of the litigation. The controlling principle is thus stated in *Gibson's Suits in Chancery* [citation omitted]: "But the operation of the maxim is confined to misconduct connected with the particular matter in litigation; and does not extend to any misconduct, however gross, which is unconnected therewith, and with which the defendant is not concerned."
>
> . . . .
>
> "The misconduct which falls within this maxim must have infected the cause of action, so that to entertain it would be violative of conscience. It must relate directly to the very transaction concerning which complaint is made, and not merely the general morals or conduct of the person seeking relief."

8

*Chappell,* 308 S.W.2d at 421-22 (citing *Overton v. Lewis*, 152 Tenn. 500, 279 S.W. 801, 802 (1926)).

Culbreath's criminal conviction stems from transactions which are separate and distinct from the July 2, 1990, loan transaction which is the basis of the instant lawsuit. There has been no showing of unclean hands on the part of Culbreath in regard to the fraudulent loan transaction that predicated this litigation. Accordingly, we decline to find that the lawsuit is barred by this equitable maxim.

Having disposed of the issues related to the award of compensatory damages, the Court turns its attention to the award of punitive damages. First Tennessee asserts that it was error to award punitive damages for three reasons: (1) First Tennessee, as a successor corporation, was not the wrongdoer; (2) the trial court failed to undertake the analysis required by *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992); and (3) the $9 million award is unconstitutional.

First Tennessee is a successor corporation which never engaged in the offending conduct. We find no cases in this state addressing a successor's liability for punitive damages. Therefore, we must look elsewhere for guidance to determine a successor's liability for punitive damages in such circumstances. In *Martin v. Johns-Manville Corp.*, 469 A.2d 655 (Pa. Super. Ct. 1983), *vacated on other grounds*, 494 A.2d 1088 (Pa. 1985), the Superior Court of Pennsylvania developed the "Degree of Identity Test," which it explained as follows:

> [I]t would make little if any sense to impose punitive damages on the successor, for the actors responsible for the predecessor's reckless misconduct -- shareholders, officers, directors, and management personnel -- would neither be punished nor deterred from similar conduct by such an award. And if the successor had remedied the defect, there would be no conduct to deter, whereas if it had not, it would be liable in punitive damages for its own actions. Thus we agree with appellees to this extent -- that it does not follow from the propriety of a compensatory award against a successor that punitive damages may also be imposed, even if the predecessor was reckless.

*Id.* at 666-67; *see also In re Related Asbestos Cases*, 566 F. Supp. 818, 822 (N.D. Cal. 1983).

The Pennsylvania court went on to explain that the successor might be liable for punitive damages in circumstances when it is engaged in a mere continuation of the predecessor's business activities. The court stated:

9

We believe, however, that in some circumstances a successor should be held accountable for the recklessness of its predecessor. ***This will be so when the goals that underlie the imposition of punitive damages -- punishment and deterrence -- will be advanced.*** In this regard, we may draw from the various formulations of the rule permitting the imposition of successor liability when the successor is a ***mere "continuation"*** of its predecessor. [Citations omitted]. We believe that when a legal change in corporate identity is not accompanied by major changes in the identity of the predecessor's shareholders, officers, directors, and management personnel, the imposition of punitive damages against the successor for the reckless conduct of the predecessor may be proper as advancing the goals of punishment and deterrence. For the actors responsible for the predecessor's reckless conduct will be punished and also deterred from similar conduct in the future. . . .

We therefore hold that punitive damages are recoverable against a successor corporation when the plaintiff has shown such a degree of identity of the successor with its predecessor as to justify the conclusion that those responsible for the reckless conduct of the predecessor will be punished, and the successor will be deterred from similar conduct.

*Martin*, 469 A.2d at 667 (emphases added).

The United States Court of Appeals for the Sixth Circuit reached a similar conclusion in ***Drayton v. Jiffee Chemical Corp.***, 591 F.2d 352 (6th Cir. 1978). The court affirmed the district court's conclusion that a successor corporation with new management would not be liable for a predecessor corporation's misconduct where the successor had purged itself of any misconduct. ***Id.*** at 366.

Culbreath relies upon ***Moran v. Johns-Manville Sales Corp.***, 691 F.2d 811 (6th Cir. 1982), to rebut ***Drayton***. In ***Moran***, the Sixth Circuit called ***Drayton*** into question and held that the successor corporation would be liable for punitive damages arising from the tortious conduct of its predecessor. In so holding, the ***Moran*** court rejected the defendant's argument that it should escape liability for punitive damages because the persons responsible for the decision were no longer in the company's employ. The court stated, "It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's liability." ***Id.*** at 817.

However, in ***Sterling v. Velsicol Chemical Corp.***, 855 F.2d 1188 (6th Cir. 1988), a case decided after ***Moran***, the Sixth Circuit revisited its holdings in both ***Drayton*** and ***Moran***, stating:

This court has cautioned that the award of punitive damages is inappropriate where the successor corporation was a new and different entity and where the successor corporation and its owners are wholly innocent of the allegedly unlawful activities. ***Drayton v.***

10

> ***Jiffee Chem. Corp.*** [citation omitted]. However in ***Drayton***, the trial
> court noted both improving industry practices, and a change in
> corporate ownership, as weighing against such an award. Velsicol
> provides no evidence of such beneficial changes in either its practices
> or management to merit the alleviation of such an award. ***See Moran***
> ***v. Johns-Manville Sales Corp.*** [citation omitted].

*Id.* at 1215 n.27.

Culbreath cites ***Davis v. Celotex Corp.***, 420 S.E.2d 557 (W. Va. 1992), in which the West Virginia Supreme Court of Appeals addressed an asbestos-related case and affirmed the imposition of punitive damages against a successor corporation. However, the court noted that the successor corporation had continued the egregious business practices of the predecessor. The court stated:

> Thus, we conclude that when an asbestos manufacturer has
> actual or constructive knowledge of the severe health hazards caused
> by a product and continues to manufacture and distribute that product,
> the manufacturer may be found liable for punitive damages to those
> injured by the product.

*Id.* at 561. The Court further stated:

> While we find Celotex's argument without merit, this is not
> to say that every acquisition or merger will automatically result in
> punitive damage liability. Here, at the time of the merger, the
> extreme health hazards associated with asbestos products were well
> known. The continuation of the business was a direct and deliberate
> product of the merger. Thus, we conclude that when a corporation
> acquires or merges with a company manufacturing a product that is
> known to create serious health hazards, and the successor corporation
> continues to produce the same product in the same manner, it may be
> found liable for punitive damages for liabilities incurred by the
> predecessor in its manufacture of such product.

*Id.* at 564.

First Tennessee concedes that it assumed the liabilities of Community First as a result of the merger, and such liability is provided for in the merger agreement. Also, assumption of liability from a merger is provided by both state law, T.C.A. § 48-21-108(c), and particularly by federal law, 12 U.S.C. § 215a, which provides in relevant part:

> One or more national banking associations or one or more
> State banks, with the approval of the Comptroller, under an
> agreement not inconsistent with this subchapter, may merge into a

11

national banking association located within the same State, under the charter of the receiving association. The merger agreement shall --

. . . .

(4) provide that the receiving association shall be liable for all liabilities of the association or State bank being merged into the receiving association.

In *Douglas v. Bank of New England/Old Colony, N.A.*, 566 A.2d 939 (R.I. 1989), the Rhode Island Supreme Court, interpreting 12 U.S.C. § 215a, held that a successor bank would be liable for punitive damages arising from the tortious conduct of its predecessor, even when it was not shown that the successor had knowledge of the existence of the lawsuit at the time of the merger. With all due respect to our sister state, we decline to follow its decision because we find that the holding in *Douglas* is contrary to the public policy of this state undergirding punitive damages.

In *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), the Tennessee Supreme Court "restrict[ed] the availability of punitive damages, . . . to avoid 'dull[ing] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct.'" *Id.* at 901 (quoting *Tuttle v. Raymond*, 494 A.2d 1353 (Me. 1985)). Our Supreme Court stated:

> [B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence. This higher standard of proof is appropriate given the twin purposes of punishment and deterrence: fairness requires that a defendant's wrong be clearly established before punishment, as such, is imposed; awarding punitive damages only in clearly appropriate cases better effects deterrence.

*Id.* (footnote omitted).

In *Bowen v. W.R. Grace & Co.*, 781 F. Supp. 682 (D. Mont. 1991), a federal district court concluded:

> Most jurisdictions hold that corporations are liable for the torts of the companies they acquire when liabilities are expressly assumed as part of the acquisition. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977). In this case, Defendant expressly assumed the liabilities of [the predecessor]. It cannot argue that it had no responsibility for or connection to the company it acquired.
>
> However, successor liability applies only to compensatory damages. *See In re Related Asbestos Cases*, 566 F. Supp. 818, 822-23 (N.D. Cal. 1983). . . . Any evidence as to the fraudulent, malicious, or oppressive conduct of Defendant's predecessor would

therefore be irrelevant in proving Defendant's responsibility for punitive damages.

781 F. Supp. at 683.

The federal court in *In re Related Asbestos Cases*, 566 F. Supp. 818 (N.D. Cal. 1983), addressed the purpose of awarding punitive damages against a successor corporation:

> Punitive damages serve only to punish and deter the wrongdoer. Unlike compensatory damages, punitive damages provide a windfall to a plaintiff. If a plaintiff is unable to recover punitive damages, he will not suffer unrectified injury.
>
> . . . .
>
> It is apparent from the foregoing that under California law the imposition of punitive damages upon a corporation is based upon its own fault. It is not imposed vicariously by virtue of the fault of others.

*Id.* at 822.

There is no evidence that First Tennessee adopted or otherwise continued the policies and practices of Community First. Community First was merged into First Tennessee in February 1995. All Community First officers left the employ of the bank at the time of the merger. In the initial complaint, Culbreath sued two individual defendants, Jack Lampley and Rowe Belcher. Lampley, the loan officer for the transaction in question, retired in March 1991, nearly four years before the merger with First Tennessee, and Belcher was not employed by First Tennessee after the merger.

In *Wood v. Emerson Electric Co.*, No. 01A01-9310-CH-00467, 1994 WL 716270 (Tenn. Ct. App. Aug. 12, 1994) (*no perm. app. filed*), the Middle Section of this Court upheld a trial court's decision striking down a punitive damages award based upon, *inter alia*, the fact that the defendant company had removed the offending parties from its place of employment. In this case, not only did First Tennessee not employ any of the offending Community First employees, but also, First Tennessee substituted its own policies and procedures in place of those promulgated by Community First. Moreover, there is no proof in the record showing that Community First on other occasions engaged in such egregious conduct as is complained of in the case-at-bar.

We conclude that to assess punitive damages against First Tennessee would offend

13

the policy announced by the Tennessee Supreme Court in **Hodges**, **supra**. First Tennessee committed no post-merger acts that could be taken into consideration under the **Hodges** criteria in assessing punitive liability. In fact, the only consideration given to First Tennessee's post-merger circumstances was its net worth, which was approximately $900 million as reported in the bank's 1997 annual report.

In assessing punitive damages, the trial court relied on the fact that Community First shareholders became shareholders in First Tennessee through a stock swap. The stock exchange took place at the holding company level. The shareholders of Community Bancshares, Inc., the sole shareholder of Community First, became shareholders of First Tennessee National Corporation, the sole shareholder of First Tennessee. According to the record, the approximately 3.2 million outstanding shares of Community Bancshares, Inc. were exchanged for approximately 800,000 shares of stock in First Tennessee National Corporation. Even after a stock split in 1996 in which the First Tennessee National Corporation shares would have doubled to 1.6 million shares, those shares represented just over one percent (1%) of the 128,209,000 outstanding shares of First Tennessee National Corporation.

In addition to the foregoing, we conclude that the trial court failed to undertake the analysis required by **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896 (Tenn. 1992). In **Hodges**, the Tennessee Supreme Court enumerated nine factors that trial courts should consider when determining whether to award punitive damages:

> (1)     The defendant's financial affairs, financial condition, and net worth;
>
> (2)     The nature and reprehensibility of defendant's wrongdoing, for example
> >     (A)     The impact of defendant's conduct on the plaintiff, or
> >     (B)     The relationship of defendant to plaintiff;
>
> (3)     The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
>
> (4)     The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
>
> (5)     The expense plaintiff has borne in the attempt to recover the losses;
>
> (6)     Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;
>
> (7)     Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8)     Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9)     Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Id.* at 901-02.

In the present case, the trial court stated that it had "considered all the criteria set forth in" **Hodges**. However, when considering net worth, the trial court linked Community First's misconduct to First Tennessee's $900 million net worth. While the punitive damages award may be only one percent (1%) of First Tennessee's net worth, $9 million amounts to some forty-three percent (43%) of Community First's pre-merger net worth of approximately $21 million.

An analysis of First Tennessee's financial affairs, condition, and net worth reveal the obvious -- that it is a large corporation with assets which cause it to be able to pay substantial compensatory damages awards and even punitive damages awards where appropriate. The nature and reprehensibility of Community First's wrongdoing is another consideration, and it is evident that Community First's conduct negatively impacted Culbreath and contributed to his seeking bankruptcy protection. However, the egregious conduct was committed by Community First and not First Tennessee.

Moreover, we conclude that the trial court misapprehended Community First's motivation in causing the harm and in desiring to obtain the property. The trial court found that because Community First had lost money in 1990 and 1991, that loss "furnish[ed] . . . an evil motive for the Bank to foreclose on the fraudulent Trust Deed to put Five Hundred Thousand Dollars in equity on their asset sheet." In fact, Community First had no obligation to bid at the foreclosure sale, and no foreclosure sale occurred. Culbreath was, nonetheless, forced to sell his interest in the property to his business partner. Moreover, Culbreath's chief asset, the Brooks Road property, was not, contrary to the trial court's finding, totally encumbered. In fact, there was approximately $400,000 in equity in that property even after the encumbrance that was created by the fraudulent loan transaction.

We do not find any evidence to support the conclusion that Community First was trying to steal the Brooks Road property in order to aid its own ailing financial condition. To the contrary, the evidence showed that the parties entered into the January 1993 consent order in the trial

15

court in which Culbreath and Community First agreed to stay foreclosure as long as Culbreath met certain obligations, which included repayment of legitimate and outstanding indebtedness to Community First.

The duration of the fraudulent conduct is not easily determinable in this case. Being part of a financial transaction, the conduct was limited to a specific time in 1990, though it is without question that its effects continue to the present. Nonetheless, Community First did not conceal its conduct, and it even attempted to exercise what the bank thought were its rights under the deed of trust by initiating foreclosure proceedings.

There has been no showing that Community First or its successor, First Tennessee, profited in any way from the conduct, nor has there been any showing that Community First or First Tennessee has ever engaged in other similar activity, much less that either bank has ever been subject to other punitive damages awards. Finally, there is little evidence in the record to indicate when the misconduct became known or whether Community First attempted to rectify the wrongdoing. What is apparent is that First Tennessee had no knowledge of the wrongdoing and no opportunity to cure it until more than four years after the fraudulent transaction in July 1990. By the time of First Tennessee's involvement in February 1995, this lawsuit had been pending since June 1992, a period of almost three years.

Upon consideration of the foregoing *Hodges* factors, we conclude that this is not an appropriate case for the imposition of punitive damages. In light of our holding, we need not address the remaining issues raised by First Tennessee relating to the constitutionality of the punitive damages award.

We reverse that portion of the trial court's judgment awarding punitive damages to Culbreath. In all other respects, the trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed one-half to Don L. Culbreath and one-half to First Tennessee Bank National Association for which execution may issue if necessary.

_____
FARMER, J.

_____

16

CRAWFORD, P.J., W.S.


_____
LILLARD, J.